## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRIENDS OF ANIMALS,<br>777 Post Road, Suite 205<br>Darien, CT 06820; and<br><br>ZIMBABWE CONSERVATION TASK FORCE,<br>3 Fairbairn Drive<br>Mount Pleasant<br>Harare<br>Zimbabwe,<br><br>      *Plaintiffs*,<br>v.<br><br>RYAN ZINKE, in his official capacity<br>as Secretary of the Interior,<br>U.S. Department of the Interior<br>1849 C Street, N.W.<br>Washington D.C., 20240; and<br><br>UNITED STATES FISH AND WILDLIFE<br>SERVICE, an agency of the United States,<br>1849 C Street, N.W.<br>Washington D.C., 20240,<br><br>      *Defendants*. | Civ. No._____ |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

## INTRODUCTION AND SUMMARY OF COMPLAINT

1.      In the early part of the 20th century, there may have been as many as three to five million African elephants in the wild. By the end of the century, that number had dropped to just around one million elephants throughout Africa. Today, there are fewer than 350,000 and many recent scientific reports suggest that elephants in the wild will be extinct within a few decades.

2.      While it is something most Americans would like to ignore, truth be told, the United States is one of the largest contributors to the demise of wild African elephants over the past century. Outside of China, America is home to more ivory and ivory-products than any other nation. Much of this ivory was legally taken before elephants were placed on the list of endangered and threatened species. But a good deal of the ivory currently in the United States was illegally poached.

3.      Of course, poachers are not the only ones contributing to this decline. Each year, hundreds of non-African hunters, a large majority of whOM are American, go to Africa to kill elephants with the biggest tusks. These so-called sport or trophy hunters like to pride themselves on the notion that they are "conservationists," and that the money they spend on these expensive hunting trips will go to helping protect elephants in the wild.

4.      These hunters, and many non-hunters who have supported them, are no doubt influenced by the rhetoric spewed by the National Rifle Association (NRA) and Safari Club International. For decades, these have groups spent substantial money persuading us that hunting is the best way to fund sustainable wildlife conservation.

5.      In truth, however, legal sport-hunting reduces the overall chance that these species can continue to survive in the wild. Legalized hunting falsely suggests that funds are being used to ensure wild populations are being protected and that the species is recovering. At the same time, it reinforces the belief that exotic animal trophies should be highly desired. In fact, studies show that increased opportunities to legally kill these

animals directly correlates to increased demand for those species and, thus, illegal poaching.

6.      Sadly, the very laws—both in the United States and internationally—designed to protect African elephants have failed the species time-and-time again. For instance, under the Endangered Species Act (ESA), the importation of sport-hunted African elephants is prohibited unless the United States Fish and Wildlife Service (FWS) can make a specific determination that the hunting of a specific elephant will in fact work to "enhance the [overall] survival of the species." This is a finding that most scientists would deem a very difficult one to make when we are talking about killing an animal whose species is in rapid decline, particularly when the killing is done for "sport."

7.      Nonetheless, for decades now FWS has routinely issued permits to American hunters to do exactly that—travel to Africa to shoot these magnificent animals and claim their trophy. No doubt, FWS itself has succumbed to the rhetoric and pressure of the NRA and the Safari Club. In fact, when one examines the records associated with these permits, there is simply no evidence that hunting overall has contributed anything to the recovery and protection of elephants in the wild. To the contrary, as evidenced by several recent predictions of the demise of many African animals by the end of this century, legal hunting, which has been lawful in many African counties for decades, has in fact utterly failed to protect the overall viability of these amazing animals.

8.      One bright spot for African elephants occurred beginning in 2014. Due to mounting evidence that the government of Zimbabwe was failing to protect elephants within its borders, in 2014 and 2015, FWS made so-called "negative enhancement findings" determining that trophy hunting in Zimbabwe would not enhance the survival of the species. FWS's findings were based on several concerns, including Zimbabwe's inadequate elephant management strategy, concerns about Zimbabwe's enforcement of wildlife management laws, and Zimbabwe's scientifically indefensible hunting quotas.

9.    The 2014 and 2015 negative enhancement findings were challenged in federal court by sport hunting organizations. Both findings were upheld by this Court in 2016.

10.    Although nothing has changed with respect to management of elephants within Zimbabwe, on November 17, 2017 (ironically just days after the Zimbabwe National Army placed long-time president Robert Mugabe under house arrest and seized control of the country), FWS reversed its position and issued a "positive enhancement finding," allowing for American hunters to once again seek permits to import elephants that were or will be hunted in Zimbabwe from January 21, 2016 through December 31, 2018. 82 Fed. Reg. 54405 (hereinafter, "2017 Decision" or "2017 Positive Enhancement Finding").

11.    FWS issued the 2017 Decision despite the political instability in Zimbabwe, unchanged hunting quotas in the country, and mounting evidence on the negative impacts of trophy hunting. The 2017 Decision also announced a new policy on future enhancement findings, stating that FWS will no longer publish these decisions in the Federal Register. Finally, in making this new finding, FWS failed to give the public notice of, and an opportunity to comment on, the new rule and change in policy, and failed to articulate a rational explanation for its position.

12.    Friends of Animals and the Zimbabwe Conservation Task Force (collectively, "Plaintiffs") come now before this Court seeking injunctive and declaratory relief. Specifically, Plaintiffs request that the Court declare that Federal Defendants acted arbitrarily and capriciously, violated the law, and abused their discretion in issuing the 2017 Decision and approving permits in accordance with that Decision.

## JURISDICTION

13.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), and 5 U.S.C. §§ 701-706 (Administrative Procedure Act). This Court may grant the relief requested under 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief) and 5 U.S.C. §§ 701-706.

14.    Venue lies in the District of Columbia pursuant to 28 U.S.C. § 1391(e) because the Defendants have their principal offices in this District, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

15.    Plaintiff FRIENDS OF ANIMALS sues on behalf of itself and its adversely affected members. Friends of Animals is a nonprofit international animal advocacy organization incorporated in the state of New York since 1957. Friends of Animals seeks to free animals from cruelty and exploitation around the world, and to promote a respectful view of non-human, free-living, and domestic animals. Friends of Animals engages in a variety of advocacy programs in support of these goals. Friends of Animals informs its members about animal advocacy issues as well as the organization's progress in addressing these issues through its magazine, *Action Line*, its website, and other reports. In particular, Friends of Animals has a long-standing commitment to protecting animals imperiled due to animal-exploitation markets.

16.    Friends of Animals and its members have a significant interest in African elephant conservation generally, and specifically in elephants residing in Zimbabwe. Friends of Animals actively works to protect African species in their native habitats. Friends of Animals funds and participates in habitat restoration and recovery efforts for threatened and endangered African animals. Friends of Animals regularly monitors Federal Defendants' compliance with federal laws and international agreements. Friends of Animals regularly comments on federal actions that affect animals subject to exploitative markets, such as trophy hunting. Friends of Animals intervened on behalf of the Federal Government in a lawsuit defending the previous findings that trophy hunting of elephants in Zimbabwe did not enhance the survival of the species.

17.    Additionally, Friend of Animals members regularly observe and photograph African elephants in Zimbabwe. For example, Mr. Johnny Rodrigues, a member of Friends of

Animals and founder of Zimbabwe Conservation Task Force, has observed elephants his entire life. He enjoys viewing and photographing elephants throughout Zimbabwe, and has done so in Hwange, Kariba, Gonarezhous, Chiredzi, and Zambesi Valley. He believes elephants are wonderful, majestic, highly social and intelligent animals, and that humans have a lot to learn from them. He has also studied how elephants contribute to the ecosystem and promote vegetation through the seeds they eat and defecate. He has noticed that elephant numbers in Zimbabwe are dropping. He is upset that elephants are hunted for sport and has observed how hunting elephants also has a lasting, negative impact on the remaining animals in his country. He fears that his ability to view elephants in the future will be compromised if hunting and poaching continue. He also fears that future generations, such as his children (who are also members of Friends of Animals) and grandchildren, will not have the opportunity to see them in the wild if sport hunting and poaching continue.

18.    Plaintiff ZIMBABWE CONSERVATION TASK FORCE (ZCTF) is a registered NGO in the Republic of Zimbabwe. ZCTF opened its headquarters in Harare, Zimbabwe, in 2001 under the direction of Mr. Johnny Rodrigues, founder and chairman of the board. ZCTF works with all sectors of society to promote and ensure the sustainability of African wildlife for current and future generations. Since its inception as a local group, it has expanded as a major player in the conservation of African wildlife. Most conservation groups left Zimbabwe in the late 1990s, fleeing the country due to internal political strife. ZCTF quickly became one of the foremost wildlife watchdog groups in Zimbabwe. ZCTF works with hundreds of volunteers on the ground and abroad, growing on the faith and passion of all of those committed to saving Zimbabwe's wildlife. ZCTF has also worked to prevent the trade of live elephants, as well as prevent the trade of animals that have been killed, and their parts. Of particular concern to ZCTF is the impact sport hunting is having

on elephants and other wildlife. ZCTF has observed firsthand how the lack of adequate government planning and regulation is devastating Zimbabwe's elephants.

19.    Plaintiffs and their members enjoy viewing, studying, and observing African elephants in Zimbabwe and surrounding areas.

20.    Plaintiffs and their members have been, are being, and unless the relief requested herein is granted, will continue to be adversely affected by the challenged actions.

21.    The relief requested in this lawsuit can redress these injuries by ensuring that Federal Defendants do not authorize the importation of elephant trophies. An order preventing the importation of elephant trophies, until such time as Federal Defendants comply with all applicable federal laws, will discourage trophy hunting. Such relief will also reduce the international transport and trade of threatened elephants. At the very least, the relief requested ensures Federal Defendants employ a more transparent and informed decisionmaking process when determining whether to issue a permit for the importation of threatened elephant trophies.

22.    Defendant UNITED STATES FISH AND WILDLIFE SERVICE is an agency housed in the U.S. Department of Interior. FWS is responsible for issuing the permit at issue. In doing so, FWS must comply with the ESA and all other applicable laws.

23.    Defendant RYAN ZINKE is the United States Secretary of the Interior and is sued in his official capacity. Secretary Zinke is responsible for ensuring that agencies housed within the Department of the Interior, including FWS, comply with the ESA, the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES), the National Environmental Policy Act (NEPA), and all other applicable laws and treaties.

\\

\\

\\

## STATUTORY AND REGULATORY BACKGROUND

A.     **The Endangered Species Act.**

24.    The purpose of the Endangered Species Act (ESA) is to conserve threatened and endangered species and the ecosystems upon which these species depend in the United States and throughout the world. 16 U.S.C. § 1531(b). The Supreme Court recognized that by enacting the ESA, Congress "intended endangered species to be afforded the highest priorities." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 174 (1978).

25.    In enacting the ESA, Congress expressly provided authority for listing non-native species that are deemed endangered in their home ranges in other countries. Congress's decision to include authority for listing of non-native species was based in part upon a desire to make the United States a leader in protecting species and their ecosystems both domestically and worldwide.

26.    The fundamental method by which the ESA protects threatened and endangered species is its aggressive restriction on take of ESA-listed species, including the prohibition on the importation of such species into the United States.

27.    The African elephant (*Loxodonta africana*) is listed as threatened under the ESA. 50 C.F.R. § 17.11(h).

28.    Federal regulations implementing the ESA prohibit the import or export, as well as the possession, sale, and receipt of African elephants, except for in limited circumstances with a valid permit. 50 C.F.R. § 17.40(e)(iii)(2); 50 C.F.R. § 23.13.

29.    Federal regulations require FWS to determine whether a particular applicant seeking to import African elephants meets stringent requirements intended to conserve the species.

30.    Federal regulations prohibit the importation of sport-hunted elephant trophies unless a determination is made that the killing of the animal will enhance the survival of the species. 50 C.F.R. § 17.40(e)(6)(i)(B).

31.   The ESA's implementing regulations require that FWS consider the following factors when determining whether to issue a permit:

(i) Whether the purpose for which the permit is required is adequate to justify removing from the wild or otherwise changing the status of the wildlife sought to be covered by the permit;

(ii) The probable direct and indirect effect which issuing the permit would have on the wild populations of the wildlife sought to be covered by the permit;

(iii) Whether the permit, if issued, would in any way, directly or indirectly, conflict with any known program intended to enhance the survival probabilities of the population from which the wildlife sought to be covered by the permit was or would be removed;

(iv) Whether the purpose for which the permit is required would be likely to reduce the threat of extinction facing the species of wildlife sought to be covered by the permit;

(v) The opinions or views of scientists or other persons or organizations having expertise concerning the wildlife or other matters germane to the application; and

(vi) Whether the expertise, facilities, or other resources available to the applicant appear adequate to successfully accomplish the objectives stated in the application.

50 C.F.R. § 17.32(a)(2).

32.   Under the general permit requirements, FWS may not issue a permit to import African elephants if, among other reasons: the applicant failed to demonstrate a valid justification for the permit and a showing of responsibility; the authorization requested potentially threatens a wildlife or plant population; or the applicant is otherwise not qualified. 50 C.F.R. § 13.21(b).

33.   In determining whether to issue a permit, "[t]he issuing officer shall consider all relevant facts or information available, and may make independent inquiry or investigation to verify information or substantiate qualifications asserted by the applicant." 50 C.F.R. § 13.21(d).

**B.    The Administrative Procedure Act.**

34.    The Administrative Procedure Act (APA) governs internal procedures of administrative agencies, including how they interact with the public. The APA is codified at 5 U.S.C. §§ 551-559, and defines an "agency" broadly to mean "each authority of the Government of the United States," unless expressly excluded by the Act.

35.    FWS is not expressly excluded from the APA.

36.    "Agency action" is defined by the APA as "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). A "rule" is defined as "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." *Id.* § 551(4).

37.    Before making a rule, an agency must publish notice of the proposed rulemaking in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. 5 U.S.C. § 553(b).

38.    The notice must include: "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id.* §§ 553(b)(1)-(3).

39.    After notice, the agency must give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments. 5 U.S.C. § 553(c). The agency must publish notice of a substantive rule at least thirty days before its effective date, except for "(1) a substantive rule which grants or recognizes an exemption or relieves a restriction; (2) interpretative rules and statements of policy; or (3) as otherwise provided by the agency for good cause found and published with the rule." *Id.* § 553(d).

## FACTUAL BACKGROUND

**A.    African Elephants: Description and Status.**

40.    The African elephant (*Loxodonta africana*) is the largest land animal on Earth. Scientists have carefully catalogued astounding examples of elephant intelligence and emotional capacity for many decades. Scientific American recently published an article stating that "scientists now have solid evidence that elephants are just as brilliant as they are big: They are adept tool users and cooperative problem solvers; they are highly empathetic, comforting one another when upset; and they probably do have a sense of self." Ferris Jabr, *The Science Is In: Elephants Are Even Smarter Than We Realized*, Scientific American (Feb. 26, 2014).

41.    Elephants are highly social animals that form strong, permanent bonds with their family or herd. Female elephants will generally remain with their herd for their entire lives.

42.    An elephant's capacity for grief and sadness rivals our own. It is well established that elephants remember and mourn dead family members for years, and even decades after their deaths. Elephants have been observed to stand over a stillborn baby for days with their head and ears hanging down, quiet and moving slowly as if they are depressed. Others have observed orphaned elephant babies that have seen their mothers shot wake up at night screaming.

43.    Cynthia Moss, the director of the Amboseli Elephant Research Project, has studied African elephants for over forty years. She has repeatedly documented the grief that elephants go through when a member of their family is killed. In one account, she described the response of elephants when a member of the herd had been shot:

> Teresia and Trista became frantic and knelt down and tried to lift her up. They worked their tusks under her back and under her head. At one point they succeeded in lifting her into a sitting position but her body flopped back down. Her family tried everything to rouse her, kicking and tusking her, and

> Tullulah even went off and collected a trunkful of grass and
> tried to stuff it in her mouth.

Cynthia Moss, *Elephant Memories: Thirteen Years in the Life of an Elephant Family*, 73 (University of Chicago Press 2000).

44.   The African elephant is also among the world's most commercially valuable animals.

45.   African elephants are exploited for trophies and for their ivory, which is used in ornaments, jewelry, or other products.

46.   The African elephant population continues to drop at an alarming rate due to habitat destruction, illegal poaching, and legal sport hunting.

47.   According to the most comprehensive elephant survey, the Great Elephant Census, an estimated 144,000 elephants were lost between 2007 and 2014 alone.

**B.      Previous Enhancement Findings.**

48.   In a Federal Register notice published in 1997, FWS announced that it had made an enhancement finding for African elephants from Zimbabwe. 62 Fed. Reg. 44627 (Aug. 22, 1997). FWS stated that any future changes in the enhancement finding would be published in the Federal Register. 62 Fed. Reg. at 44633.

49.   In April 2014, FWS made an interim finding that it could not determine killing elephants in Zimbabwe would enhance the survival of the species ("2014 Interim Negative Enhancement Finding").

50.   FWS published notice of the finding in the Federal Register on May 12, 2014. Interim Suspension of Imports of Elephant Trophies From Zimbabwe, 79 Fed. Reg. 26986.

51.   As a result of the April 2014 Interim Negative Enhancement Finding, FWS temporarily suspended imports of sport-hunted African elephant trophies from Zimbabwe.

52.   FWS also asked Zimbabwe for additional information and considered information from safari outfitters and professional hunting organizations.

53.   In July 2014, FWS issued a final negative enhancement finding ("2014 Final Negative Enhancement Finding"). *See* Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe during 2014 (July 22, 2014); *see also* 79 Fed. Reg. 44459 (July 31, 2014).

54.   FWS found that Zimbabwe's elephant management strategy was unclear and that FWS lacked information on whether Zimbabwe was enforcing wildlife management laws and allocating hunting revenue to elephant conservation.

55.   FWS also observed that Zimbabwe did not have adequate information on elephant populations to establish scientifically defensible hunting quotas.

56.   Based on the 2014 Final Negative Enhancement Finding, trophies, parts or products of elephants taken in Zimbabwe after April 4, 2014 could not be imported into the United States.

57.   Following the 2014 Final Negative Enhancement Finding, FWS continued to consider information from Zimbabwe, Safari Club, and other pro-hunting organizations.

58.   In March 2015, FWS made another negative enhancement finding for African elephants killed in Zimbabwe in 2015 ("2015 Negative Enhancement Finding"). *See* Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe On or After January 1, 2015 (Mar. 26, 2015); *see also* 80 Fed. Reg. 42524 (July 17, 2015).

59.   In the March 2015 Negative Enhancement Finding, FWS explained that it lacked information on Zimbabwe's implementation of elephant conservation goals, incorporation of recent population data into its management plan, and use of revenue generated from sport hunting.

60.   FWS identified several concerns with Zimbabwe's management of elephants including: (1) the lack of a current management plan; (2) the current population status of elephants in Zimbabwe; (3) poaching levels and prevention; (4) regulations and

enforcement concerns; (5) the sustainable utilization of elephants in Zimbabwe; and (6) the utilization of hunting revenues.

61.   Based on the 2015 Negative Enhancement Finding, trophies, parts or products of elephants taken in Zimbabwe during the 2015 hunting season and future hunting seasons, could not be imported into the United States.

**C.     Challenges to Previous Enhancement Findings.**

62.   Hunting organizations filed two separate actions against FWS alleging violations of the ESA and APA—the first shortly after the 2014 Interim Negative Enhancement Finding and the second shortly after the 2015 Negative Enhancement Finding. The district court consolidated summary judgment briefing for the two cases.

63.   The district court granted FWS's motion for summary judgment holding that none of the findings were arbitrary or capricious. *Safari Club Int'l v. Jewell*, 213 F. Supp. 3d 48 (D.D.C. 2016).

64.   The district court found that the 2014 Interim Negative Enhancement Finding was based on the lack of updated information from Zimbabwe (*Id*. at 72-73); the 2014 Final Negative Enhancement Finding was permissibly based on evidence regarding poaching and on FWS's conclusions that the available population data was inadequate to determine the status of the population or to understand Zimbabwe's management of the species (*Id*. at 73-77); and that Zimbabwe's elephant management and laws were an area of continuing concern (*Id*. at 77-78).

65.   The district court also found that the 2015 Negative Enhancement Finding was permissibly based on a number of ongoing concerns, including the Zimbabwean government's inability to sustainably manage its elephants, its failure to incorporate new survey data into its management, and its limited capacity to enforce its laws regarding elephant management. *Id*. at 81.

66.   The Safari Club appealed the district court's decision.

67.    Following briefing and oral argument, a decision has not yet been issued by the D.C. Court of Appeals.

**D.    2017 Positive Enhancement Finding.**

68.    On November 17, 2017, FWS reversed the 2015 Negative Enhancement Finding and issued a determination that the killing of African elephant trophy animals in Zimbabwe, on or after January 21, 2016, and on or before December 31, 2018, will enhance the survival of the African elephant. 82 Fed. Reg. 54405.

69.    FWS determined that all applications to import trophies hunted during this time will be considered to have met the enhancement requirement.

70.    FWS claims the 2017 Positive Enhancement Finding was based primarily on a National Elephant Management Plan that Zimbabwe signed on January 21, 2016.

71.    FWS also claims that the 2017 Positive Enhancement Finding was based on Zimbabwe's changed process for establishing hunting quotas, and that Zimbabwe's hunting quotas will be based on sustainable utilization, and will take into account biological factors and other forms of offtake.

72.    There is no indication that FWS's concerns, as identified in the previous Negative Enhancement Findings, have been addressed or fixed by the National Elephant Management Plan.

73.    The National Elephant Management Plan acknowledges it "is an ambitious plan" and that implementation would "require more human and financial resources than are currently available for the conservation and management of elephants in Zimbabwe."

74.    FWS also acknowledged that Zimbabwe does not currently have sufficient resources to fully implement the Elephant Management Plan.

75.    Zimbabwe has not changed its annual hunting quotas since the 2014 and 2015 Negative Enhancement Findings.

76.    Multiple surveys show that the Zimbabwe elephant population continues to decline. According to the Great Elephant Census, the Zimbabwe elephant population declined by approximately six percent between 2001 and 2014.

77.    According to the International Union for Conservation of Nature's African Elephant Specialist Group, the Zimbabwe population declined by approximately eighteen percent between 2007 and 2013.

78.    The 2017 report of the African Elephant Specialist Group to the CITES Standing Committee also confirmed that Zimbabwe's elephant population continues to decline.

79.    The Great Elephant Census also documented near eight-percent carcass ratios in Zimbabwe, which indicates poaching is at or near a level that is high enough to cause the population to decline.

80.    Trophy hunting compounds the problems facing the elephants by increasing the demand for elephants, increasing opportunities for laundering animal parts, and by disrupting elephants' natural behaviors and social structure.

81.    Several individuals on the United States sanctions list of Specially Designated Nationals and Blocked Persons have been associated with Zimbabwean safari and hunting industries and linked to poaching and trafficking networks.

82.    FWS acknowledges "evidence of corruption or collusion within the wildlife sector" that raise concerns about Zimbabwe's ability to control resources.

83.    Prior to issuing the 2017 Decision, concerns about Zimbabwe's ability to enforce its management plan, the declining elephant populations, as well as poaching and corruption in Zimbabwe have not been addressed.

84.    FWS reversed its policy on the importation of sport-hunted elephant parts with no rational explanation.

85.    Because Zimbabwe lacks the ability and resources to implement its conservation laws and conduct populations surveys, prevent poaching, or protect and

restore habitat, then killing additional animals through trophy hunting will only make the situation worse.

86.   FWS's determination that sport hunting elephants in Zimbabwe will enhance their survival runs counter to the evidence.

## FIRST CAUSE OF ACTION
### (Failure to provide notice and opportunity to comment)

87.   Plaintiffs hereby incorporate all preceding allegations.

88.   Federal Defendants abruptly changed their rule on the legality of the importation of trophy-hunted African elephants from Zimbabwe without first notifying the public of the change of position and/or giving the public the opportunity to formally comment.

89.   Federal Defendants also changed their previous rule requiring notice of new findings be published in the Federal Register. Federal Defendants made this change without first notifying the public and giving them the opportunity to formally comment.

90.   In making the 2017 Decision and authorizing the importation of elephants hunted in Zimbabwe, Federal Defendants' actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, and should be set aside under the Administrative Procedure Act, 5 U.S.C. § 706.

## SECOND CAUSE OF ACTION
### (Failure to act in accordance with the APA and ESA)

91.   Plaintiffs herein incorporate all preceding allegations.

92.   Federal Defendants abruptly changed their rule on the legality of importing sport-hunted elephant trophies from Zimbabwe without a reasoned explanation.

93.   Federal Defendants' finding and analysis in the 2017 Positive Enhancement Finding is inconsistent with their previous findings. Federal Defendants failed to provide a rational explanation for these inconsistencies.

94.   Federal Defendants' 2017 Positive Enhancement Finding runs counter to the evidence before the agency.

95.   Federal Defendants failed to articulate a satisfactory explanation for the 2017 Positive Enhancement Finding, and failed to consider important aspects of the problems with trophy hunting of elephants.

96.   The evidence indicates that killing African elephants in Zimbabwe will not enhance the survival of the species.

97.   Federal Defendants' actions in issuing the 2017 Decision and authorizing the importation of African elephants hunted in Zimbabwe, were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, and should be set aside under the Administrative Procedure Act, 5 U.S.C. § 706.

### REQUESTED RELIEF

Plaintiffs respectfully request that this Court enter judgment providing the following relief:

A.   Declare that Federal Defendants violated the ESA and APA by issuing the 2017 Decision without providing the public notice and an opportunity to comment;

B.   Declare that Federal Defendants violated the ESA and APA by issuing the 2017 Decision without providing the public notice and an opportunity to comment;

C.   Declare that Federal Defendants violated the ESA and APA by issuing the 2017 Decision and changing their positions from the 2014 and 2015 Negative Enhancement Findings without providing rational explanation;

D.   Declare unlawful and set aside Federal Defendants' decision authorizing the importation of elephant trophies from Zimbabwe until such time as Federal Defendants have complied with the law;

E.   Award Plaintiffs' costs, including reasonable attorney fees under the Equal Access to Justice Act (5 U.S.C. § 504; 28 U.S.C. § 2412); and

    F.      Grant Plaintiffs any other relief that the Court deems just and proper.

Dated: November 22, 2017               Respectfully submitted,

                                      /s/ Michael Harris
                                      Michael Ray Harris (DC Bar # CO0049)
                                      Director, Wildlife Law Program
                                      Friends of Animals
                                      7500 E. Arapahoe Rd., Ste. 385
                                      Centennial, CO 80112
                                      Telephone (720) 949-7791
                                      michaelharris@friendsofanimals.org

                                      Jennifer Best (DC Bar# CO0056)
                                      Assistant Director, Wildlife Law Program
                                      Friends of Animals
                                      7500 E. Arapahoe Rd., Ste. 385
                                      Centennial, CO 80112
                                      Telephone (720) 949-7791
                                      jennifer@friendsofanimals.org