# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FRIENDS OF ANIMALS,
777 Post Road, Suite 205
Darien, CT 06820; and

ZIMBABWE CONSERVATION TASK FORCE,          Civ. No. 17-CV-02530-RCL
3 Fairbairn Drive
Mount Pleasant
Harare
Zimbabwe,

      *Plaintiffs*,

v.

RYAN ZINKE, in his official capacity
as Secretary of the Interior,
U.S. Department of the Interior
1849 C Street, N.W.
Washington D.C., 20240; and

UNITED STATES FISH AND WILDLIFE
SERVICE, an agency of the United States,
1849 C Street, N.W.
Washington D.C., 20240,

      *Defendants*,

SAFARI CLUB INTERNATIONAL
501 Second St., NE
Washington D.C. 20002,

NATIONAL RIFLE ASSOCIATION OF
AMERICA,
11250 Waples Mill Road
Fairfax, VA 22030

      *Defendant-Intervenors.*

---

## SECOND AMENDED AND SUPPLEMENTAL COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

## INTRODUCTION AND SUMMARY OF COMPLAINT

1.      In the early part of the twentieth century, there may have been as many as three to five million African elephants in the wild. By the end of the century, that number had dropped to just around one million elephants throughout Africa. Today, the population continues to decline and many recent scientific reports suggest that elephants in the wild will be extinct within a few decades.

2.      While it is something most Americans would like to ignore, truth be told, the United States is one of the largest contributors to the demise of wild African elephants over the past century. Outside of China, America is home to more ivory and ivory-products than any other nation. Much of this ivory was legally taken before elephants were placed on the list of endangered and threatened species, but a good deal of the ivory currently in the United States was illegally poached.

3.      Of course, poachers are not the only ones contributing to this decline. Each year, hundreds of non-African hunters, a large majority of whom are American, go to Africa to kill elephants. These so-called sport or trophy hunters like to pride themselves on the notion that they are "conservationists," and that the money they spend on these expensive hunting trips will go to help protect elephants in the wild.

4.      These hunters, and many non-hunters who have supported them, are no doubt influenced by the rhetoric spewed by the National Rifle Association (NRA) and Safari Club International. For decades, these groups have spent a substantial amount of money in an attempt to persuade people that hunting is the best way to fund sustainable wildlife conservation.

5.      In truth, however, legal sport-hunting reduces the overall chance that these species can continue to survive in the wild. Legalized hunting falsely suggests that funds are being used to ensure wild populations are being protected and that the species is

recovering. At the same time, it reinforces the belief that exotic animal trophies should be highly desired. In fact, studies show that increased opportunities to legally kill these animals directly correlates to increased demand for those species and, thus, illegal poaching.

6.   Sadly, the very laws—both in the United States and internationally—designed to protect African elephants have failed the species time-and-time again. For instance, under the Endangered Species Act (ESA), the importation of sport-hunted African elephants is prohibited unless the United States Fish and Wildlife Service (FWS) can make a specific determination that, among other things, the killing of the trophy animal will enhance the survival of the species. This is a finding that most scientists would deem a very difficult one to make when we are talking about killing an animal whose species is in rapid decline, particularly when the killing is done for "sport."

7.   Nonetheless, for decades now FWS has routinely issued permits to American hunters to do exactly that—travel to Africa to shoot these magnificent animals and claim their trophy. No doubt, FWS has succumbed to pressure from the NRA and the Safari Club. In fact, when one examines the records associated with these permits, there is simply no evidence that hunting overall has contributed anything to the recovery and protection of elephants in the wild. To the contrary, as evidenced by several recent predictions of the demise of many African animals by the end of this century, hunting, which has been lawful in many African countries for decades, has in fact utterly failed to protect the overall viability of these amazing animals.

8.   One bright spot for African elephants occurred beginning in 2014. Due to mounting evidence that the government of Zimbabwe was failing to protect elephants within its borders, in 2014 and 2015, FWS made so-called "negative enhancement findings" determining that trophy hunting in Zimbabwe would not enhance the survival of the species. FWS's findings were based on several concerns, including Zimbabwe's inadequate

elephant management strategy, concerns about Zimbabwe's enforcement of wildlife management laws, and Zimbabwe's scientifically indefensible hunting quotas.

9.   The 2014 and 2015 negative enhancement findings were challenged in federal court by sport hunting organizations. Both findings were upheld by this Court in 2016.

10.   Although nothing changed with respect to management of elephants within Zimbabwe, on November 17, 2017 (ironically just days after the Zimbabwe National Army placed long-time president Robert Mugabe under house arrest and seized control of the country), FWS completely reversed its official position and issued a enhancement finding, allowing for American hunters to once again seek permits to import elephants that were or will be hunted in Zimbabwe from January 21, 2016 through December 31, 2018. 82 Fed. Reg. 54405 (hereinafter, "2017 Decision" or "2017 Enhancement Finding").

11.   FWS issued the 2017 Decision despite the political instability in Zimbabwe, unchanged hunting quotas in the country, and mounting evidence on the negative impacts of trophy hunting. The 2017 Decision also announced a new policy on future enhancement findings, stating that FWS will no longer publish these decisions in the Federal Register. Finally, in making this new finding, FWS failed to give the public notice of, and an opportunity to comment on, the new rule and change in policy, and failed to articulate a rational explanation for its position.

12.   On December 22, 2017, the D.C. Circuit affirmed this Court's determination that the 2014 and 2015 Negative Enhancement Findings were within FWS's discretion and not arbitrary and capricious under the Administrative Procedure Act (APA). *Safari Club. v. Zinke*, 878 F.3d 316 (D.C. Cir. 2017).

13.   The D.C. Circuit did find, however, that, as argued by Friends of Animals and Zimbabwe Conservation Task Force, FWS erred in adopting the enhancement findings without first following the notice and comment rulemaking requirements of the APA. Accordingly, the D.C. Circuit remanded, but did not vacate, the case to FWS "so that it may

initiate rulemaking to address the enhancement findings for the time periods at issue in this case." *Safari Club*, 878 F.3d at 336. The mandate issued on February 14, 2018.

14.    Faced with a remand of the 2014 and 2015 Negative Enhancement Findings, as well as the potential remand 2017 Enhancement Finding for failure to follow the rulemaking requirements of the APA, FWS issued a memorandum on March 1, 2018 that purports to withdraw all previous, countrywide enhancement findings FWS has made regarding the import of African elephant trophies (hereinafter, "2018 Withdrawal Memo"). Specifically, the 2018 Withdrawal Memo states that it rescinds, among other findings, the 1997, 2014, 2015, and 2017 Enhancement Findings for African elephants taken in Zimbabwe; the 1997, 2014, and 2015 Enhancement Findings for African elephants taken in Tanzania; the 1995 Enhancement Finding for African elephants taken in South Africa; the 1997 Enhancement Finding for African elephants taken in Botswana; the 1995 Enhancement Finding for African elephants taking in Namibia; the 2012 and 2017 Enhancement Findings for African elephants taken in Zambia; and the 2014, 2015, and 2017 non-detriment findings for African elephant trophies taken in Tanzania.

15.    The 2018 Withdrawal Memo substantively changed FWS's long-term policy of issuing country-wide enhancement findings. The 2018 Withdrawal Memo established a new policy of making enhancement findings on a case-by-case basis without notice to the public or opportunity for the public to comment on the enhancement findings.

16.    Friends of Animals and the Zimbabwe Conservation Task Force (collectively, "Plaintiffs") come now before this Court seeking injunctive and declaratory relief. Specifically, Plaintiffs request that the Court declare that Federal Defendants acted arbitrarily and capriciously, violated the law, and abused their discretion in issuing the 2017 Decision and approving permits in accordance with that Decision. Similarly, Plaintiffs request that the Court declare that Federal Defendants acted arbitrarily and capriciously, violated the law, and abused their decision in issuing the 2018 Withdrawal Memo. Finally,

Plaintiffs request that the Court declare that the Federal Defendants 2018 Withdrawal Memo exceeds their statutory authority by authorizing FWS to make decisions as to what is necessary and advisable for the conservation of African elephants on a case-by-case basis without providing notice, or inviting comments from interested parties.

## JURISDICTION

17.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), and 5 U.S.C. §§ 701-706 (Administrative Procedure Act). This Court may grant the relief requested under 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief) and 5 U.S.C. §§ 701-706.

18.   Venue lies in the District of Columbia pursuant to 28 U.S.C. § 1391(e) because the Defendants have their principal offices in this District, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

19.   Plaintiff FRIENDS OF ANIMALS sues on behalf of itself and its adversely affected members. Friends of Animals is a nonprofit international animal advocacy organization incorporated in the state of New York since 1957. Friends of Animals seeks to free animals from cruelty and exploitation around the world, and to promote a respectful view of non-human, free-living, and domestic animals. Friends of Animals engages in a variety of advocacy programs in support of these goals. Friends of Animals informs its members about animal advocacy issues as well as the organization's progress in addressing these issues through its magazine, *Action Line*, its website, and other reports. In particular, Friends of Animals has a long-standing commitment to protecting animals imperiled due to animal-exploitation markets.

20.   Friends of Animals and its members have a significant interest in African elephant conservation generally, and specifically in elephants residing in Zimbabwe.

Friends of Animals actively works to protect African species in their native habitats. Friends of Animals funds and participates in habitat restoration and recovery efforts for threatened and endangered African animals. Friends of Animals regularly monitors Federal Defendants' compliance with federal laws and international agreements. Friends of Animals regularly comments on federal actions that affect animals subject to exploitative markets, such as trophy hunting. Friends of Animals intervened on behalf of the Federal Government in a lawsuit defending the previous findings that trophy hunting of elephants in Zimbabwe did not enhance the survival of the species.

21.   Additionally, Friend of Animals members regularly observe and photograph African elephants in Zimbabwe. For example, Mr. Johnny Rodrigues, a member of Friends of Animals and founder of Zimbabwe Conservation Task Force, has observed elephants his entire life. He enjoys viewing and photographing elephants throughout Zimbabwe, and has done so in Hwange, Kariba, Gonarezhous, Chiredzi, and Zambesi Valley. He believes elephants are wonderful, majestic, highly social and intelligent animals, and that humans have a lot to learn from them. He has also studied how elephants contribute to the ecosystem and promote vegetation through the seeds they eat and defecate. He has noticed that elephant numbers in Zimbabwe are dropping. He is upset that elephants are hunted for sport and has observed how hunting elephants also has a lasting, negative impact on the remaining animals in his country. He fears that his ability to view elephants in the future will be compromised if hunting and poaching continue. He also fears that future generations, such as his children (who are also members of Friends of Animals) and grandchildren, will not have the opportunity to see them in the wild if sport hunting and poaching continue.

22.   Plaintiff ZIMBABWE CONSERVATION TASK FORCE (ZCTF) is a registered NGO in the Republic of Zimbabwe. ZCTF opened its headquarters in Harare, Zimbabwe, in 2001 under the direction of Mr. Johnny Rodrigues, founder and chairman of the board. ZCTF

works with all sectors of society to promote and ensure the sustainability of African wildlife for current and future generations. Since its inception as a local group, it has expanded as a major player in the conservation of African wildlife. Most conservation groups left Zimbabwe in the late 1990s, fleeing the country due to internal political strife. ZCTF quickly became one of the foremost wildlife watchdog groups in Zimbabwe. ZCTF works with hundreds of volunteers on the ground and abroad, growing on the faith and passion of all of those committed to saving Zimbabwe's wildlife. ZCTF has also worked to prevent the trade of live elephants, as well as prevent the trade of animals that have been killed, and their parts. Of particular concern to ZCTF is the impact sport hunting is having on elephants and other wildlife. ZCTF has observed firsthand how the lack of adequate government planning and regulation is devastating Zimbabwe's elephants.

23.    Plaintiffs and their members enjoy viewing, studying, and observing African elephants in Zimbabwe and surrounding areas.

24.    Plaintiffs and their members have been, are being, and unless the relief requested herein is granted, will continue to be adversely affected by the challenged actions.

25.    The relief requested in this lawsuit can redress these injuries by ensuring that Federal Defendants do not authorize the importation of elephant trophies. An order preventing the importation of elephant trophies, until such time as Federal Defendants comply with all applicable federal laws, will discourage trophy hunting. Such relief will also reduce the international transport and trade of threatened elephants. At the very least, the relief requested ensures Federal Defendants employ a more transparent and informed decisionmaking process when determining whether to issue a permit for the importation of threatened elephant trophies.

26.    Defendant UNITED STATES FISH AND WILDLIFE SERVICE is an agency housed in the U.S. Department of the Interior. FWS is responsible for issuing the rules at issue. In

doing so, FWS must comply with the ESA and all other applicable laws.

27.    Defendant RYAN ZINKE is the United States Secretary of the Interior and is sued in his official capacity. Secretary Zinke is responsible for ensuring that agencies housed within the Department of the Interior, including FWS, comply with the ESA, the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES), the National Environmental Policy Act (NEPA), and all other applicable laws and treaties.

## STATUTORY AND REGULATORY BACKGROUND

### A.    The Endangered Species Act.

28.    The federal Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*, is the most comprehensive legislation for the preservation of species in the world.

29.    Through the ESA, Congress established a program for the conservation of endangered species and threatened species. *See* 16 U.S.C. § 1531.

30.    The ESA defines the terms conserve, conserving, and conservation as:

> to use and the use of all methods and procedures which are necessary to bring endangered species and threatened species to the point at which measures provided [in the ESA] are no longer necessary.  Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.

16 U.S.C. § 1532(3).

31.    Congress mandates that federal agencies utilize their authorities to carry out the conservation purposes of the ESA. 16 U.S.C. §§ 1531(a)(4), (b), (c)(1). In enacting the ESA, Congress expressly provided authority for listing non-native species that are deemed endangered in their home ranges in other countries. Congress' decision to include authority for the listing of non-native species was based in part upon a desire to make the United

States a leader in protecting species and their ecosystems both domestically and worldwide.

32.   The fundamental method by which the ESA protects endangered species is its aggressive restrictions on take of ESA-listed species, including the prohibition on the importation of such species and their parts into the United States.

33.   Congress recognized the need to restrict or prohibit importation of species because aiding a market for endangered and threatened species parts and trophies can threaten the species' continued survival.

34.   The ESA does not expressly provide for trophy sport hunting of endangered or threatened species as a means to conserve those species.

35.   The ESA does not expressly authorize payments by private individuals to foreign governments in exchange for the ability to trophy hunt endangered or threatened species in those countries as a method of enhancing the survival of those species so that private individuals can then import their sport-hunted trophies.

**B.     The Administrative Procedure Act.**

36.   The Administrative Procedure Act (APA) governs the internal procedures of administrative agencies, including how they interact with the public. The APA defines an "agency" broadly to mean "each authority of the Government of the United States," unless expressly excluded by the Act.

37.   The APA authorizes a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law" 5 U.S.C. § 706(2).

38.   FWS is not expressly excluded from the APA.

39.   The APA defines "agency action" as "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. §

551(13). The APA defines "rule" to include "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." *Id.* § 551(4).

40.   According to the APA, "rule making" is the "agency process for formulating, amending, or repealing a rule." *Id.* § 551(5).

41.   Before making a rule, an agency must publish notice of the proposed rulemaking in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. 5 U.S.C. § 553(b).

42.   The notice must include: "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id.* §§ 553(b)(1)-(3).

43.   After notice, the agency must give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments. 5 U.S.C. § 553(c). The agency must publish notice of a substantive rule at least thirty days before its effective date, except for "(1) a substantive rule which grants or recognizes an exemption or relieves a restriction; (2) interpretative rules and statements of policy; or (3) as otherwise provided by the agency for good cause found and published with the rule." *Id.* § 553(d).

## FACTUAL BACKGROUND

### A.   African Elephants: Description and Status.

44.   The African elephant (*Loxodonta africana*) is the largest land animal on Earth. Scientists have carefully catalogued astounding examples of elephant intelligence and emotional capacity for many decades. Scientific American recently published an article stating that "scientists now have solid evidence that elephants are just as brilliant as they

are big: They are adept tool users and cooperative problem solvers; they are highly empathetic, comforting one another when upset; and they probably do have a sense of self." Ferris Jabr, *The Science Is In: Elephants Are Even Smarter Than We Realized*, Scientific American (Feb. 26, 2014).

45.   Elephants are highly social animals that form strong, permanent bonds with their family or herd. Female elephants will generally remain with their herd for their entire lives.

46.   An elephant's capacity for grief and sadness rivals our own. It is well established that elephants remember and mourn dead family members for years, and even decades after their deaths. Elephants have been observed to stand over a stillborn baby for days with their head and ears hanging down, quiet and moving slowly as if they are depressed. Others have observed orphaned elephant babies that have seen their mothers shot wake up at night screaming.

47.   Cynthia Moss, the director of the Amboseli Elephant Research Project, has studied African elephants for over forty years. She has repeatedly documented the grief that elephants go through when a member of their family is killed. In one account, she described the response of elephants when a member of the herd had been shot:

> Teresia and Trista became frantic and knelt down and tried to lift her up. They worked their tusks under her back and under her head. At one point they succeeded in lifting her into a sitting position but her body flopped back down. Her family tried everything to rouse her, kicking and tusking her, and Tullulah even went off and collected a trunkful of grass and tried to stuff it in her mouth.

Cynthia Moss, *Elephant Memories: Thirteen Years in the Life of an Elephant Family*, 73 (University of Chicago Press 2000).

48.   The African elephant is also among the world's most commercially exploited animals.

49.   African are taken for trophies, for their skin, and for their ivory, which is used in ornaments, jewelry, or other products.

50.   The African elephant population continues to drop at an alarming rate due to habitat destruction, illegal poaching, and legal sport hunting.

51.   According to the most comprehensive elephant survey, the Great Elephant Census, an estimated 144,000 elephants were lost between 2007 and 2014 alone.

**B.      Plight of African Elephants in Zimbabwe.**

52.   Multiple surveys show that the Zimbabwe elephant population continues to decline. According to the International Union for the Conservation of Nature's African Elephant Specialist Group, the Zimbabwe elephant population declined by approximately eighteen percent between 2007 and 2013.

53.   According to the Great Elephant Census, the Zimbabwe elephant population declined by approximately six percent between 2001 and 2014.

54.    The Great Elephant Census also documented near eight-percent carcass ratios in Zimbabwe, which indicates take is at or near a level that is high enough to cause the population to decline.

55.   The 2017 report of the African Elephant Specialist Group to the CITES Standing Committee also confirmed that Zimbabwe's elephant population continues to decline, and found that poaching has escalated in the past ten years and is a major problem in Zimbabwe.

56.   Trophy hunting compounds the problems facing elephants by increasing the demand for elephants, increasing opportunities for laundering animal parts, and by disrupting elephants' natural behaviors and social structure.

57.   The United States is the leading importer of African elephant remains from trophy hunting.

58.   Zimbabwe does not have an effective management plan in place to conserve its African elephant population or oversee trophy hunting.

59.   Zimbabwe's program designed to empower the local community to control wildlife and associated revenue, the Communal Areas Management Progamme for Indigenous Resources (CAMPFIRE), has failed to achieve its goals. Revenue generated through elephant hunting does not actually benefit local communities or promote effective elephant conservation. For example, CAMPFIRE was in place in the Sebungwe region of Zimbabwe, where elephant populations declined 74 percent from 2001 to 2014.

60.   Additionally, Zimbabwe has failed to alter its African elephant export quota established under CITES despite continued population declines.

61.   Evidence of corruption in Zimbabwe further demonstrates that trophy hunting in the country does not enhance the survival of the species.

62.   Wildlife trade and trafficking increase along with sanctioned hunting in countries with high levels of corruption.

63.   The Transparency International's 2016 Corruption Perception Index measures perceived levels of public sector corruption based on expert opinion and is based on a scale of 0 (highly corrupt) to 100 (very clean). The Index scored Zimbabwe 22.

64.   Several individuals on the United States sanctions list of Specially Designated Nationals and Blocked Persons have been associated with Zimbabwean safari and hunting industries and linked to poaching and trafficking networks.

65.   Former First Lady, Grace Mugabe, is also under investigation for smuggling ivory to foreign markets.

66.   FWS acknowledges "evidence of corruption or collusion within the wildlife sector" that raise concerns about Zimbabwe's ability to control resources.

**C.**     **Protection of African Elephants under the ESA.**

67.     The African elephant (*Loxodonta africana*) is listed as a threatened species under the ESA. 50 C.F.R. § 17.11(h).

68.     For threatened species, Section 4(d) of the ESA provides:

> Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 9(a)(1) [16 USCS § 1538(a)(1)], in the case of fish or wildlife, or section 9(a)(2) [16 USCS § 1538(a)(2)]. . .

16 U.S.C. § 1533(d).

69.     FWS has issued a default regulation providing that threatened species receive the same protection as endangered species under the ESA, unless FWS issues a species-specific regulation.

70.     FWS has issued multiple species-specific regulations under Section 4(d) regarding conservation of African elephants.

71.     Since the African elephant has been listed under the ESA, it has had a special Section 4(d) rule that prohibits the import or export, as well as the possession, sale, and receipt of African elephants, except for in limited circumstances with a valid permit.

72.     In 1997, the Section 4(d) Rule provided a limited exception for the import of African elephant trophies into the United States from Zimbabwe and other countries, provided specific conditions were met: (A) the trophy originates in a country for which FWS has received notice of that country's African elephant ivory quota for the year of export; (B) the person seeking to import the trophy complies with all of the requirements of 50 C.F.R. parts 13 and 23; (C) a determination is made that the killing of the animal whose trophy is intended for import would enhance survival of the species; and (D) the trophy is legibly marked [as set forth in the regulation]. 50 C.F.R. 17.40(e) (1992); 62 Fed. Reg. 44627 (August 22, 1997) (hereinafter, "1997 Special Rule").

15

73.   The 1997, 2014, and 2015 Enhancement Findings for African elephants taken from Zimbabwe were issued while the 1997 Special Rule was in effect.

74.   Under the 1997 Special Rule, FWS made enhancement findings for importation of sport-hunted elephant trophies on a country-wide basis for Botswana, Namibia, and Zimbabwe and committed to publish notice of changes in the enhancement findings in the Federal Register.

75.   The requirement that the Service publish notice of changes in enhancement findings is binding on the agency. *Safari Club Int'l v. Jewell*, 213 F. Supp. 3d 48, 70 (D.D.C. 2016).

76.   FWS amended the Special 4(d) Rule for African elephants in July 2016. 81 Fed. Reg. 36,388 (June 6, 2016).

77.   The July 6, 2016 Special 4(d) amendments do not purport to make any retroactive changes to previous Special 4(d) rules.

78.   Under July 6, 2016 Special 4(d) rule, the importation of sport-hunted African elephant trophies is still prohibited except where:

> (A) The trophy was legally taken in an African elephant range country that declared an ivory export quota to the CITES Secretariat for the year in which the trophy animal was killed;
>
> (B) A determination is made that the killing of the trophy animal will enhance the survival of the species and the trophy is accompanied by a threatened species permit issued under 50 C.F.R. § 17.32;
>
> (C) The trophy is legibly marked in accordance with 50 C.F.R. Part 23;
>
> (D) The requirements in 50 C.F.R. Parts 13, 14 and 23 have been met; and
>
> (E) No more than two African elephant sport-hunted trophies are imported by any hunter in a calendar year.

50 C.F.R. § 17.40(e)(6).

79.   FWS regulations require consideration of the following factors when determining whether to authorize the import of an African elephant trophy:

(i) Whether the purpose for which the permit is required is adequate to justify removing from the wild or otherwise changing the status of the wildlife sought to be covered by the permit;

(ii) The probable direct and indirect effect which issuing the permit would have on the wild populations of the wildlife sought to be covered by the permit;

(iii) Whether the permit, if issued, would in any way, directly or indirectly, conflict with any known program intended to enhance the survival probabilities of the population from which the wildlife sought to be covered by the permit was or would be removed;

(iv) Whether the purpose for which the permit is required would be likely to reduce the threat of extinction facing the species of wildlife sought to be covered by the permit;

(v) The opinions or views of scientists or other persons or organizations having expertise concerning the wildlife or other matters germane to the application; and

(vi) Whether the expertise, facilities, or other resources available to the applicant appear adequate to successfully accomplish the objectives stated in the application.

50 C.F.R. § 17.32(a)(2).

80. When considering the impacts of trophy hunting on threatened species, FWS also uses the standards established by the International Union for the Conservation of Nature to determine the impacts of trophy hunting and evaluates, on a country specific basis: (1) biological sustainability; (2) net conservation benefit; (3) socio-economic-cultural benefit; (4) adaptive management; and (5) accountable and effective governance.

81. Overall, FWS can authorize the import of an African elephant trophy only if the agency determines that the killing and import of that threatened species enhances the survival of the species, meaning that the activity must go beyond having a neutral affect and have a positive effect on the species' conservation. *See* U.S. Fish and Wildlife Service Handbook for Endangered and Threatened Species Permits (1996).

**D.      Enhancement Findings for African Elephants in Zimbabwe Under the 1997 Special Rule.**

82. In a Federal Register notice published in 1997, FWS announced that it had made an enhancement finding for African elephants from Zimbabwe. 62 Fed. Reg. 44627 (Aug. 22, 1997). FWS stated that any future changes in the enhancement finding would be published in the Federal Register. 62 Fed. Reg. at 44633.

83. In April 2014, FWS made an interim finding that it could not determine killing elephants in Zimbabwe would enhance the survival of the species ("2014 Interim Negative Enhancement Finding").

84. FWS published notice of the finding in the Federal Register on May 12, 2014. Interim Suspension of Imports of Elephant Trophies From Zimbabwe, 79 Fed. Reg. 26986.

85. As a result of the April 2014 Interim Negative Enhancement Finding, FWS temporarily suspended imports of sport-hunted African elephant trophies from Zimbabwe.

86. FWS also asked Zimbabwe for additional information and considered information from safari outfitters and professional hunting organizations.

87. In July 2014, FWS issued a final negative enhancement finding ("2014 Final Negative Enhancement Finding"). *See* Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe during 2014 (July 22, 2014); *see also* 79 Fed. Reg. 44459 (July 31, 2014).

88. FWS found that Zimbabwe's elephant management strategy was unclear and that FWS lacked information on whether Zimbabwe was enforcing wildlife management laws and allocating hunting revenue to elephant conservation.

89. FWS also observed that Zimbabwe did not have adequate information on elephant populations to establish scientifically defensible hunting quotas.

90. Based on the 2014 Final Negative Enhancement Finding, trophies, parts or products of elephants taken in Zimbabwe after April 4, 2014 could not be imported into the United States.

91. Following the 2014 Final Negative Enhancement Finding, FWS continued to consider information from Zimbabwe, Safari Club, and other pro-hunting organizations.

92. In March 2015, FWS made another negative enhancement finding for African elephants killed in Zimbabwe in 2015 ("2015 Negative Enhancement Finding"). *See* Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe On or After January 1, 2015 (Mar. 26, 2015); *see also* 80 Fed. Reg. 42524 (July 17, 2015).

93. In the 2015 Negative Enhancement Finding, FWS explained that it lacked information on Zimbabwe's implementation of elephant conservation goals, incorporation of recent population data into its management plan, and use of revenue generated from sport hunting.

94. FWS identified several concerns with Zimbabwe's management of elephants including: (1) the lack of a current management plan; (2) the current population status of elephants in Zimbabwe; (3) poaching levels and prevention; (4) regulations and enforcement concerns; (5) the sustainable utilization of elephants in Zimbabwe; and (6) the utilization of hunting revenues.

95. According to the 2015 Negative Enhancement Finding, trophies, parts or products of elephants taken in Zimbabwe during the 2015 hunting season and future hunting seasons, could not be imported into the United States until additional information on the status and management of elephants in Zimbabwe became available that satisfied the conditions of the 4(d) special rule under the ESA.

**E.     Legal Challenges to the Enhancement Findings for African Elephants in Zimbabwe Under the 1997 Special Rule.**

96.     Hunting organizations filed two separate actions against FWS alleging violations of the ESA and APA—the first shortly after the 2014 Interim Negative Enhancement Finding and the second shortly after the 2015 Negative Enhancement Finding. The district court consolidated summary judgment briefing for the two cases.

97.     The district court granted FWS's motion for summary judgment holding that none of the findings were arbitrary or capricious. *Safari Club Int'l v. Jewell*, 213 F. Supp. 3d 48 (D.D.C. 2016), *rev'd in part sub nom Safari Club Int'l v. Zinke*, 878 F.3d 316 (D.C. Cir. 2017).

98.     The district court found that the 2014 Interim Negative Enhancement Finding was based on the lack of updated information from Zimbabwe (*Id.* at 72-73); the 2014 Final Negative Enhancement Finding was permissibly based on evidence regarding poaching and on FWS's conclusions that the available population data was inadequate to determine the status of the population or to understand Zimbabwe's management of the species (*Id.* at 73-77); and that Zimbabwe's elephant management and laws were an area of continuing concern (*Id.* at 77-78).

99.     The district court also found that the 2015 Negative Enhancement Finding was permissibly based on a number of ongoing concerns, including the Zimbabwean government's inability to sustainably manage its elephants, its failure to incorporate new survey data into its management, and its limited capacity to enforce its laws regarding elephant management. *Id.* at 81.

100.    The Safari Club appealed the district court's decision.

101.    Following briefing and oral argument, the D.C. Circuit issued an opinion on December 22, 2017. *Safari Club Int'l v. Zinke*, 878 F.3d 316 (D.C. Cir. 2017).

102.    In its opinion, the D.C. Circuit affirmed the judgment of this Court that the 2014 and 2015 negative enhancement findings were not arbitrary and capricious under the APA and did not violate the ESA. *Id.*

103.    In its opinion, the D.C. Circuit found that FWS's interpretation of "enhance" was reasonable and consistent with the regulation, and in no way forecloses FWS from requiring hunting to "increase" elephant survival on the whole. *Id.* at 327.

104.   In its opinion, the D.C. Circuit found that FWS had the authority under the ESA to require an affirmative demonstration that sport hunting enhances the survival of the African elephant as a precondition to import, and that Section 9(c)(2) of the ESA in no way constrains the FWS's section 4(d) authority to condition the importation of threated Appendix II species on an affirmative enhancement finding. *Id.* at 329.

105.   In its opinion, the D.C. Circuit found that the enhancement findings were rules, as opposed to adjudications, subject to notice and comment rulemaking under the APA.

**F.      2017 Enhancement Finding.**

106.   On November 17, 2017, FWS issued a determination that the killing of African elephant trophy animals in Zimbabwe, on or after January 21, 2016, and on or before December 31, 2018, will enhance the survival of the African elephant. 82 Fed. Reg. 54405.

107.   FWS determined that all applications to import elephant trophies hunted in Zimbabwe during this time will be considered to have met the enhancement requirement.

108.   FWS's November 2017 Enhancement Findings also states that the agency will no longer publish notice of changed enhancement findings for African elephant sport-hunted trophies in the Federal Register.

109.   FWS claims the 2017 Enhancement Finding was based primarily on a National Elephant Management Plan that Zimbabwe approved in January 2016.

110.   There is no indication that FWS's concerns, as identified in the previous negative enhancement findings, have been addressed or fixed by the National Elephant Management Plan.

111.   The National Elephant Management Plan acknowledges it "is an ambitious plan" and that implementation would "require more human and financial resources than are currently available for the conservation and management of elephants in Zimbabwe."

112.   FWS also acknowledged that Zimbabwe does not currently have sufficient resources to fully implement the National Elephant Management Plan.

21

113.   FWS also claims that the 2017 Enhancement Finding was based on Zimbabwe's changed process for establishing hunting quotas, and that Zimbabwe's hunting quotas will be based on sustainable utilization, and will take into account biological factors and other forms of offtake.

114.   Zimbabwe has not changed its annual hunting quotas since the 2014 and 2015 Negative Enhancement Findings.

115.   Concerns about Zimbabwe's ability to enforce its management plan, the declining elephant populations, as well as poaching and corruption in Zimbabwe have not been addressed. For example, Zimbabwe would still authorize hunting in areas where there are high levels of poaching, such as Sebungwe and Middle Zambezi.

116.   FWS did not solicit comments from the public or interested parties, such as Plaintiffs, before issuing the 2017 Decision.

117.   FWS reversed its policy on the importation of sport-hunted elephant parts with no rational explanation.

118.   Because Zimbabwe lacks the ability and resources to implement its conservation laws and conduct populations surveys, prevent poaching, or protect and restore habitat, then the killing of additional animals through trophy hunting will only make the situation worse.

119.   FWS's 2017 Decision finding that hunting elephants for sport in Zimbabwe will enhance their survival runs counter to the evidence.

120.   FWS's 2017 Decision undermines its obligations under the ESA to promote the conservation of threatened species.

121.   Following strong criticism of the 2017 Decision, President Trump tweeted that the decision was on hold until he had time to review all the conservation facts. President Trump announced his disapproval of the ban and stated he would be "very hard pressed to

change [his] mind that this horror show in any way helps conservation of Elephants or any other animal."

122.   In an interview, President Trump described the 2017 Decision as "terrible" and indicated that he does not believe the fees that hunters pay to hunt elephants actually go toward conservation efforts, as is often claimed, and instead are pocketed by government officials in other countries.

**G.     March 2018 Withdrawal Memo.**

123. Without prior notice, FWS issued the 2018 Withdrawal Memo on March 1, 2018, rescinding, among other findings, the 1997, 2014, 2015, and 2017 Enhancement Findings for sport-hunted trophies of African elephants killed in Zimbabwe.

124. FWS did not publish the 2018 Withdrawal Memo in the Federal Register.

125. FWS did not solicit public comments on the 2018 Withdrawal Memo.

126. FWS did not follow notice and comment rulemaking requirements of the APA when it issued the 2018 Withdrawal Memo.

127. The 2018 Withdrawal Memo states that FWS "intends to use the information cited in [previous] findings and contained in its files as appropriate, in addition to the information it receives and has available when it receives each application, to evaluate individual permit applications."

128. The 2018 Withdrawal Memo states that FWS intends to grant or deny permits to import sport-hunted trophies of elephants killed in Zimbabwe at any time on a case-by-case basis.

129. The 2018 Withdrawal Memo effectively allows FWS to make positive enhancement findings on individual applications despite the 2014 and 2015 negative enhancement findings and without public input.

130. The 2018 Withdrawal Memo substantively changes FWS's long-term policy of issuing country-wide enhancement findings.

131.  FWS did not provide a reasoned explanation for withdrawing previous enhancement findings or changing the policy on enhancement findings.

### FIRST CAUSE OF ACTION
### (2017 Enhancement Finding: Failure to Provide Notice and Opportunity to Comment)

132. Plaintiffs hereby incorporate all preceding allegations.

133.  In issuing the 2017 Enhancement Finding, Federal Defendants failed to comply with the notice and comment rulemaking requirements of the Administrative Procedure Act.

134.  In issuing the 2017 Enhancement Finding, Federal Defendants also abruptly changed their previous rule requiring notice of new findings be published in the Federal Register. Federal Defendants made this change without first comply with the notice and comment rulemaking requirements of the Administrative Procedure Act.

135. Federal Defendants voluntarily withdrew the 2017 Enhancement Finding before Plaintiffs' claims could be fully litigated.

136. According to the 2018 Withdrawal Memo, Federal Defendants will continue to use the information from the 2017 Enhancement Finding when making enhancement findings and permit decisions.

137. Federal Defendants' pattern of changing rules, without the proper rulemaking procedures, demonstrates the probability that the same controversy will recur involving the same parties before it can be fully litigated.

138. In making the 2017 Enhancement Finding and authorizing the importation of elephants hunted in Zimbabwe, Federal Defendants' actions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, and without the observance of procedure required by law. As such, the 2017 Decision should be set aside under the APA, 5 U.S.C. § 706.

## SECOND CAUSE OF ACTION

### (2017 Enhancement Finding: Failure to Provide a Reasoned Explanation and/or Consider Relevant Criteria)

139. Plaintiffs herein incorporate all preceding allegations.

140. Without providing an adequate, reasoned explanation, through the 2017 Enhancement Finding, Federal Defendants altered the status of African elephants in Zimbabwe as set forth in the 2014 and 2015 Negative Enhancement Findings, and changed the legal protections that had been afforded to the elephants by those earlier findings.

141. In issuing the 2017 Enhancement Finding, Federal Defendants failed to adequately consider—and in some cases ignored—relevant criteria set forth in the ESA, as well as FWS regulations and guidance.

142. In issuing the 2017 Enhancement Finding purporting to authorize the importation of elephants killed in 2016, 2017, and 2018 in Zimbabwe, Federal Defendants violated the ESA's mandate that federal agencies must utilize their authority in furtherance of the conservation purposes of the Act, and violated the requirement that killing elephants "enhance" the survival of the species.

143. The 2017 Enhancement Finding also runs counter to the evidence before the agency.

144. Federal Defendants voluntary withdrew the 2017 Enhancement Finding before Plaintiffs' claims could be fully litigated.

145. According to the 2018 Withdrawal Memo, Federal Defendants will continue to use the information from the 2017 Enhancement Finding when making enhancement findings and permit decisions.

146. Federal Defendants' pattern of changing rules, without the proper rulemaking procedures, demonstrates the probability that the same controversy will recur involving the same parties before it can be fully litigated.

25

147. Federal Defendants' actions in issuing the 2017 Enhancement Finding and authorizing the importation of African elephants hunted in Zimbabwe, is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, and without the observance of procedure required by law. As such, the decision should be set aside under the APA, 5 U.S.C. § 706.

## THIRD CAUSE OF ACTION
### (2018 Withdrawal Memo: Failure to Follow Required Rulemaking Procedures for Rescinding Previous Rules)

148. Plaintiffs herein incorporate all preceding allegations.

149. Through the 2018 Withdrawal Memo, Federal Defendants withdrew all previous countrywide enhancement findings without first notifying the public and giving the public opportunity to comment.

150. The previous enhancement findings constituted legislative rules subject to APA rulemaking procedures.

151. An agency must follow the required rulemaking procedures to withdraw legislative rules, regardless of whether the previous rules were properly adopted.

152. Federal Defendants failed to follow the required rulemaking procedures for withdrawing previous enhancement findings.

153. Federal Defendants failed to provide a reasoned explanation for withdrawing previous enhancement findings, which constituted legislative rules.

154. In making the decision to issue the 2018 Withdrawal Memo rescinding all previous enhancement findings, Federal Defendants' actions are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with the law, and without the observance of procedure required by law. As such, the decision should be set aside under the APA, 5 U.S.C. § 706.

## FOURTH CAUSE OF ACTION

### (2018 Withdrawal Memo: Violations of the 1997 Special 4(D) Rule by Withdrawing Previous Country-Wide Enhancement Findings and Issuing New Findings Without Required Notice)

155. Plaintiffs herein incorporate all preceding allegations.

156. Through the 2018 Withdrawal Memo, Federal Defendants withdrew all previous countrywide enhancement findings without first notifying the public and giving the public opportunity to comment.

157. According to the 1997 Special 4(d) Rule in effect when FWS issued the 2014 and 2015 Negative Enhancement Findings, FWS was required to make enhancement findings on a country-wide basis after publication in the Federal Register. *See* 62 Fed. Reg. at 44633.

158. Federal Defendants withdrew the 2014 and 2015 Negative Enhancement Findings contrary to the requirements of the 1997 Special 4(d) Rule.

159. Federal Defendants failed to provide a reasoned explanation or even acknowledge that they were changing the 1997 Special 4(d) Rule.

160. In making the decision to issue the 2018 Withdrawal Memo rescinding all previous enhancement findings and repealing the requirement that enhancement findings be published in the Federal Register, without the required rule making procedures, Federal Defendants actions are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with the law, and without the observance of procedure required by law. As such, the decision should be set aside under the APA, 5 U.S.C. § 706.

## FIFTH CAUSE OF ACTION

### (2018 Withdrawal Memo Violates Section 4 of the ESA and Constitutes *Ultra Vires* Agency Action)

161. Plaintiffs herein incorporate all preceding allegations.

162. The 2018 Withdrawal Memo purports to regulate threatened African elephants on a case-by-case basis, without notice to the public or consideration of

comments from interested parties.

163. For threatened species, Section 4(d) of the ESA provides:

> Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 9(a)(1) [16 USCS § 1538(a)(1)], in the case of fish or wildlife, or section 9(a)(2) [16 USCS § 1538(a)(2)]. . .

16 U.S.C. § 1533(d).

164. No provision of the ESA authorizes the Secretary to make decisions necessary for the protection of threatened species on a case-by-case basis, without notice to the public or the consideration of comments from interested parties, rather than by regulation.

165. Federal Defendants' 2018 Withdrawal Memo authorizing FWS to make enhancement findings for threatened African elephants on case-by-case basis without public input is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. Thus, Federal Defendants violated the APA, 5 U.S.C. § 706.

**REQUEST FOR RELIEF**

Plaintiffs respectfully request that this Court enter judgment providing the following relief:

A. Declare that Federal Defendants' actions issuing the 2017 Decision, without providing the public notice and an opportunity to comment, are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, and without the observance of procedure required by law in violation of the APA;

B. Declare that Federal Defendants' actions in issuing the 2017 Decision and authorizing the importation of African elephants hunted in Zimbabwe, is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, and without the observance of procedure required by law in violation of the ESA and APA;

C.   Declare unlawful and set aside Federal Defendants' 2017 Decision authorizing the importation of elephant trophies from Zimbabwe until such time as Federal Defendants have complied with the law;

D.   Declare that Federal Defendants' actions issuing the 2018 Withdrawal Memo rescinding previous enhancement findings and establishing a new substantive policy without providing the public notice and an opportunity to comment, are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, and without the observance of procedure required by law in violation of the APA;

E.   Declare that Federal Defendants' actions in issuing the 2018 Withdrawal Memo rescinding all previous enhancement findings and repealing the 1997 4(d) Special Rule's requirement that enhancement findings be published in the Federal Register, without the required rule making procedures, are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with the law, and without the observance of procedure required by law in violation of the APA and ESA;

F.   Declare that Federal Defendants' actions in issuing the 2018 Withdrawal Memo authorizing FWS to make enhancement findings and regulate threatened African elephants on case-by-case basis without notice or public input is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right in violation of the APA and ESA;

G.   Declare unlawful and set aside Federal Defendants' 2018 Withdrawal Memo until such time as Federal Defendants have complied with the law;

H.   Enjoin Federal Defendants from issuing any permits for the importation of African elephant sport-hunted trophies from Zimbabwe pursuant to either the 2017 Decision or the 2018 Withdrawal Memo until such time as Federal Defendants have complied with the law;

I.   Award Plaintiffs' costs, including reasonable attorney fees under the Equal Access to Justice Act (5 U.S.C. § 504; 28 U.S.C. § 2412); and

J.   Grant Plaintiffs any other relief that the Court deems just and proper.

Dated: March 29, 2018                              Respectfully submitted,

                                                   /s/ Michael Harris
                                                   Michael Ray Harris (DC Bar # CO0049)
                                                   Director, Wildlife Law Program
                                                   Friends of Animals
                                                   7500 E. Arapahoe Rd., Ste. 385

Centennial, CO 80112
Telephone (720) 949-7791
michaelharris@friendsofanimals.org

Jennifer Best (DC Bar# CO0056)
Assistant Director, Wildlife Law Program
Friends of Animals
7500 E. Arapahoe Rd., Ste. 385
Centennial, CO 80112
Telephone (720) 949-7791
jennifer@friendsofanimals.org