# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FRIENDS OF ANIMALS, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 17-cv-2530-RCL |
| RYAN ZINKE, in his official capacity as Secretary of the United States Department of Interior, *et al.*, | ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| SAFARI CLUB INTERNATIONAL, *et al.*, | ) ) | |
| Defendant-Intervenors | ) ) ) | |

## MEMORANDUM OPINION

In Fall 2017, the U.S Fish and Wildlife Service (the "Service") issued a new finding with respect to African elephants in Zimbabwe, determining that the permitted hunting of these elephants will enhance the survival of the species, and thus paving the way for the importation of sport-hunted elephant trophies into the United States. After the D.C. Circuit struck down two earlier country-wide enhancement findings since the Service did not subject them to the public notice and comment required by the Administrative Procedure Act ("APA"), *see Safari Club Int'l v. Zinke*, 878 F.3d 316, 331–35 (D.C. Cir. 2017) ("*Safari Club II*"), the Service withdrew a slew of other findings not subject to notice and comment, including the 2017 Zimbabwe elephant findings. Moving forward, the Service announced that it would no longer make these findings on a country-wide basis, instead choosing to make its findings on a case-by-case basis upon

application to import a sport-hunted trophy.

Two organizations—Friends of Animals ("FoA") and the Zimbabwe Conservation Task Force ("ZCTF")—bring a five-count complaint challenging the actions of the government. Second Am. Compl., ECF No. 35. Upon motion, Safari Club International and the National Rifle Association of America were permitted to intervene as defendants (the "intervenor-defendants"). Order, ECF No. 26. In claims one and two, plaintiffs challenge the now-withdrawn 2017 Zimbabwe elephant findings. Second Am. Compl. ¶¶ 132–147. In their third cause of action, plaintiffs allege that the Service violated the APA by withdrawing the various enhancement and non-detriment findings without soliciting public notice and comment. *Id.* ¶¶ 148–54. In claim four, plaintiffs argue that the Service violated the APA by withdrawing prior negative enhancement findings without following an alleged publication requirement. *Id.* ¶¶ 155–60. And in plaintiffs' fifth cause of action, plaintiffs argue that the Service exceeded its statutory authority by creating a policy whereby enhancement findings would be made on a case-by-case basis. *Id.* ¶¶ 161–65.

Now, both the government and the intervenor-defendants move to dismiss the complaint in its entirety. *See* Federal Defs.' Mot. Dismiss, ECF No. 38; Intervenor-Defendants' Mot. Dismiss, ECF No. 39. For the reasons set forth herein, those motions will be **GRANTED**.

## I.  BACKGROUND

### A.  The Convention on International Trade in Endangered Species of Wild Fauna and Flora and the Endangered Species Act

Importation into the United States of threatened species such as African elephants is governed by international convention and U.S. law.

The Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), Mar. 3, 1973, 27 U.S.T. 1087, is a multilateral treaty to which both the United States

2

and Zimbabwe are parties. *See* 16 U.S.C. § 1538(c)(1) (incorporating CITES into U.S. domestic law through the Endangered Species Act). CITES regulates the international trade of protected plants and wildlife by establishing requirements for importing and exporting covered species categorized into three appendices based on the level of protection each requires. *See id.* §§ 1537a–1539. Signatories to CITES, including the United States and Zimbabwe, agree that they "shall not allow trade in specimens of species included in Appendices I, II and III except in accordance with the provisions of" the treaty. CITES, art. II.4.

Elephants in Zimbabwe were listed on Appendix I until 1997 and now are listed on Appendix II. Changes in List of Species in Appendices to the [CITES], 62 Fed. Reg. 44,627, 44,628–29 (Aug. 22, 1997). While Appendix I lists species "threatened with extinction which are or may be affected by trade," CITES, art. II(1), Appendix II includes species that are not necessarily currently threatened but that may become threatened with extinction unless trade of specimens of such species is regulated. *Id.* art. II(2). Under CITES, a species listed on Appendix II may be traded if the exporting countries issue export permits. *Id.* art. IV. In issuing permits, the exporting country must make certain findings, including that the specimen was legally acquired, and that trade of the specimen will not be detrimental to the survival of the species (a non-detriment finding). *Id.* art. IV.2(a)–(b).

"It is undisputed that the proscriptions in [CITES] are a floor, not a ceiling, for protection of Appendix II species." *Safari Club II*, 878 F.3d at 321 (D.C. Cir. 2017). In fact, the treaty makes clear that it "in no way affect[s] the right of Parties to adopt . . . stricter domestic measures regarding the conditions for trade, taking possession or transport of specimens of species included in Appendices I, II, and II, or the complete prohibition thereof." CITES, art. XIV(1).

To that end, Congress passed the Endangered Species Act ("ESA") to provide for the conservation of "endangered" and "threatened" species. 16 U.S.C. § 1531(b). Described as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation," *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 180 (1978), the ESA not only implements CITES into U.S law but also provides federal protection to species listed as endangered or threatened pursuant to its provisions. *See* 16 U.S.C. §§ 1533(d), 1538(a). Furthermore, the listing of a species as endangered or threatened does not depend on whether or how it is categorized under CITES. *See id.* § 1533(a)(1)(A).

While the ESA generally forbids the importation of endangered species into the United States, *id.* § 1538(a)(1)(A); 50 C.F.R. § 17.21(b), the Act empowers the Service to issue regulations pertaining to threatened species "deem[ed] necessary and advisable to provide for the conservation of such species." 16 U.S.C. § 1533(d). The Service "may by regulation prohibit with respect to any threatened species [of wildlife] any act prohibited under 16 U.S.C. § 1538(a)(1)." *Id.* Pursuant to this authority, the Service has issued a regulation that extends the ESA's prohibitions on endangered species to all threatened species unless the Service has issued a special rule to govern a particular species. 50 C.F.R. §§ 17.31(a), (c); *see also Sweet Home Chapter of Cmtys. for a Great Or. v. Babbitt*, 1 F.3d 1, 5 (D.C. Cir. 1993).

## B. Factual and Procedural Background

Since the African elephant (*Loxodonta Africana*) has been listed as a threatened species under the ESA, 50 C.F.R. § 17.11(h), it has been the subject of a special species-specific rule for importation. *See id.* § 17.40(e) (current rule).

In 1997, the rule provided for a limited exception for the importation of African elephant trophies into the United States from Zimbabwe and other countries, provided five conditions were met, including that "a determination [was] made that the killing of the animal whose trophy is

4

intended for import would enhance survival of the species." 50 C.F.R. § 17.40(e) (1992) (the "1997 Special Rule"). Under this rule, the Service made positive enhancement findings in 1997 for importation of sport-hunted elephant trophies on a country-wide basis for Botswana, Namibia, and Zimbabwe. Second Am. Compl. ¶ 74, ECF No. 35. That same year, in the proposed rule announcing the transfer of African elephants from CITES Appendix I to Appendix II, the agency wrote the following about enhancement findings:

> The Service will make such findings on a periodic basis upon receipt of new information on the species' population or management. The enhancement findings for importation of sport-hunted elephant trophies from Botswana, Namibia, and Zimbabwe are on file in the Office of Management Authority and remain in effect until the Service finds, based on new information, that the conditions of the special rule are no longer met and has published a notice of any change in the Federal Register.

62 Fed. Reg. 44,627-01, 44,633 (the "1997 Proposed Rule").

The 1997 finding that the killing of African elephants in Zimbabwe whose trophies were intended for import would enhance survival of the species remained in effect until 2014. Second Am. Compl. ¶ 83. In April of that year, the Service announced an interim suspension of the importation of elephant trophies from Zimbabwe, citing insufficient information to make a positive enhancement finding. *See* 79 Fed. Reg. 26,986-01. Notice of that decision was not published in the Federal Register until May 12, 2014. *Id.* Because the 1997 Proposed Rule required the publication of notice, this Court held that the suspension did not actually go into effect until May 12, 2014. *Safari Club v. Jewell*, 213 F. Supp. 3d 48, 73 (D.D.C. 2016) (*Safari Club I*). That holding was not appealed.

In July 2014, the Service made a final determination that the import of sport-hunted African elephant trophies taken in Zimbabwe would be suspended, as the Service was "unable to determine that the killing of the animal . . . would enhance the survival of the species in the wild." 79 Fed.

5

Reg. 44459-01. In 2015, the Service reaffirmed this decision, continuing its effect indefinitely. 80 Fed. Reg. 42524-03.

The 2014 and 2015 findings were all made under the 1997 Special Rule. Second Am. Compl. ¶ 73. In 2016, the 1997 Special Rule for the importation of sport-hunted African elephant trophies was amended to increase protections for elephants. 81 Fed. Reg. 36,388 (the "2016 Amendments"). The rule left in place the requirement "that the killing of the trophy animal will enhance the survival of the species, " while adding that the trophy must be "accompanied by a threatened species permit under 50 C.F.R. § 17.32." 50 C.F.R. § 17.40(e)(6).

The intervenor-defendants challenged the 2014 and 2015 elephant findings in a case before this Court. *Safari Club Int'l v. Jewell*, Case No. 1:14-cv-670-RCL. Although this Court upheld the 2014 and 2015 elephant findings, *see Safari Club I*, F. Supp. at 81 (D.D.C. 2016), the D.C. Circuit held that the findings were legislative rules that the Service failed to subject to public notice and comment under the APA. *Safari Club II*, 878 F.3d at 333. It therefore ordered this Court to remand the case to the Service so that it could initiate proper rulemaking to address enhancement findings for the relevant time periods. *Id.* at 336.

Prior to the D.C. Circuit's opinion, the Service issued the new enhancement finding at issue in this case. On November 16, 2017, the Service concluded that hunting elephants in Zimbabwe enhances the survival of the species, opening the door for the importation of elephant trophies hunted in 2016, 2017, and 2018. *See* 82 Fed. Reg. 54,405. Additionally, the Service stated that because the 2016 Amendments require that "all imports will be accompanied by a threatened species permit evaluated through the ESA permit application process found at 50 C.F.R. § 17.32(a), [it would] no longer publish notice of changed enhancement findings for African elephant sport-hunted trophies in the Federal Register." *Id.*

On November 22, 2017, plaintiffs filed this suit, asserting (1) that the Service failed to provide notice and the opportunity to comment before making the country-wide findings; and (2) that the Service failed to act in accordance with the APA and the ESA . *See generally* Compl., ECF No. 1. Just before the D.C. Circuit's opinion in *Safari Club II*, plaintiffs added a cause action challenging import permits granted under the 2017 findings. *See* Am. Compl., ECF No. 6. Then, the D.C. Circuit issued its opinion regarding the 2014 and 2015 elephant findings in December 2017. *Safari Club II*, 878 F.3d 316.

In response to that opinion, the Principal Deputy Director of the Service signed a memorandum on March 1, 2018, (the "March Memo") announcing the withdrawal of the 2014 and 2015 Zimbabwe elephant findings in response to the D.C. Circuit's opinion in *Safari Club II*. Second Am. Compl. ¶ 123; Intervenor-Defendants' Mot. Dismiss Ex. 1, ECF No. 42-1.[1] "Consistent with this approach," the Service also withdrew the positive 2017 Zimbabwe elephant enhancement finding challenged in this case, along with various country-wide enhancement and non-detriment findings. Intervenor-Defendants' Mot. Dismiss Ex. 1; Second Am. Compl. ¶ 123. Moreover, the March Memo announced that "[a]t this time, when the Service processes [permit application for the importation of sport-hunted trophies of these species], the Service intends to do so on an individual basis, including making ESA enhancement determinations, and CITES non-

---

[1] The Court will consider the March Memo in conjunction with this motion. Defendants move to dismiss the case both for lack of jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6). When considering a motion to dismiss for lack of jurisdiction, the court "is not limited to the allegations of the complaint." *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987). For 12(b)(6) motions, "where a document is referred to in the complaint and is central to plaintiffs claim, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment." *Vanover v. Hantman*, 77 F.Supp.2d 91, 98 (D.D.C.1999) (citing *Greenberg v. The Life Insurance Company of Va.*, 177 F.3d 507, 514 (6th Cir.1999)); *see also Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991) (holding that district court may consider stock purchase agreement, offering memorandum, and warrant, on a motion to dismiss, even when these materials were not attached to complaint). Here, the March Memo is properly considered because it is central to the plaintiffs' claims, and the complaint even quotes directly from it. *See* Second Am. Compl. ¶ 127.

7

detriment determinations when required, for each application." Intervenor-Defendants' Mot. Dismiss Ex. 1. In other words, the Service announced an intention "to grant or deny permits to import a sport-hunted trophy on a case-by-case basis." *Id.* However, the March Memo makes clear that the Service intends to use the information cited in the 2017 Zimbabwe lion and elephant findings and other withdrawn findings "as appropriate, in addition to the information it receives and has available when it receives each application, to evaluate individual permit applications." *Id.*; Second Am. Compl. ¶ 127.

In response to the March Memo, plaintiffs amended the complaint to remove the count related to individual permits and to add three new counts: (1) a claim challenging the Service's failure to employ notice-and-comment rulemaking to withdraw all previous country-wide enhancement findings; (2) a claim that the Service failed to follow the 1997 Special Rule's notice requirement before withdrawing the rules; and (3) a claim that the Service violated the APA by changing to a case-by-case approach for making enhancement and non-detriment findings is in excess of statutory authority and in violation of the APA. *Id.* ¶¶ 148–65. Both the government and the defendant-intervenors move to dismiss the Second Amended Complaint in its entirety, challenging some claims under Rule 12(b)(1), some claims under 12(b)(6), and some claims under both.

## II.    LEGAL STANDARD

In evaluating a motion to dismiss under either Rule 12(b)(1) or 12(b)(6), the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) (citations omitted)); *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir.

2011). Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept the plaintiff's legal conclusions. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

### A. Subject Matter Jurisdiction

Under Rule 12(b)(1), the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002). Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C.Cir.2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction."). "[B]ecause subject-matter jurisdiction is 'an Art[icle] III as well as a statutory requirement . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003) (quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982)).

When considering a motion to dismiss for lack of jurisdiction, unlike when deciding a motion to dismiss under Rule 12(b)(6), the court "is not limited to the allegations of the complaint." *Hohri*, 782 F.2d at 241. Rather, "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000) (citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)); *see also Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

### B. Failure to State a Claim

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 566). A pleading must offer more than "'labels and conclusions'" or a "'formulaic recitation of the elements of a cause of action,'" *id.* (quoting *Twombly*, 550 U.S. at 555), and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

When considering a motion to dismiss under Rule 12(b)(6), the complaint is construed liberally in the plaintiff's favor, and the Court should grant the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions. *See id.*; *see also Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

### C. APA Notice-and-Comment Rule Making

Under the APA, when an agency proposes to promulgate a rule, it must follow the procedures set out in 5 U.S.C. § 553. Among other things, the statute requires the agency to publish a notice "of proposed rule making" in the Federal Register. *Id.* § 553(b). Then, it must "give interested persons an opportunity to participate in the rule making through submission" of comments, which the agency must consider. *Id.* § 553(d).

## III.   ANALYSIS

### A. Plaintiffs' challenges to the 2017 finding are moot.

In their first two causes of action, plaintiffs specifically challenge the 2017 elephant finding, claiming it was issued arbitrarily and capriciously or otherwise not in accordance with law because: (1) the Service failed to solicit public notice and comment; (2) the Service failed to provide a reasoned explanation for altering the status of elephants in Zimbabwe set forth in the 2014 and 2015 findings; and (3) the Service failed to adequately consider relevant criteria set forth in the ESA. Second Am. Compl. ¶¶ 132–147. Plaintiffs ask this Court to declare that the 2017 finding violates the APA and the ESA, to set aside the 2017 enhancement finding, and to enjoin the Service from issuing any permits pursuant to that findings. *Id.* at 28–29. But the positive 2017 finding was withdrawn by the March Memo.

Under Article III, the "judicial power" extends only to "Cases" and "Controversies." U.S. Const. art. III, s 2. "To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) (citations and internal quotation marks omitted). And "no justiciable controversy is presented . . . when the parties are asking for an advisory opinion, [or] when the question sought to be adjudicated has been mooted by subsequent developments." *Flast v. Cohen*, 392 U.S. 83, 95 (1968). A "case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). "Corrective action by an agency is one type of subsequent development that can moot a previously justiciable issue." *Nat. Res. Def. Council, Inc. v. U.S. Nuclear Regulatory Comm'n*, 680 F.2d 810, 814 (D.C. Cir. 1982).

Here, the challenged findings are no longer in effect. The Court, therefore, can provide the plaintiffs with no meaningful relief. The fact that they seek declaratory relief—in addition to injunctive relief—does not change the analysis. "The Article III case or controversy requirement is as applicable to declaratory judgments as it is to other forms of relief." *Conyers v. Reagan*, 765 F.2d 1124, 1127 (D.C. Cir. 1985).

The Court cannot set aside findings that have already been withdrawn. And to declare that the withdrawn findings violate the APA or ESA for the purpose of instructing the Service how to approach future findings amounts to an advisory opinion. Federal courts "are not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong." *Spencer v. Kemna*, 523 U.S. 1, 18 (1998).

Plaintiffs argue that claims one and two fall under the capable-of-repetition-yet-evading-review exception to the mootness doctrine. A case is capable of repetition and yet evades review when "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action." *Clarke v. United States*, 915 F.2d 699, 704 (D.C. Cir. 1990). Plaintiffs argue that this exception applies to our case because the Service stated it will use the information from the withdrawn findings as appropriate to evaluate individual permit applications. Pls.' Opp. Mot. Dismiss 18, ECF No. 47.

The Court is not persuaded. Whether or not the Service relies on the same information to make its individual enhancement determinations does not give the withdrawn country-wide findings any operational effect in and of themselves. Instead, the proper vehicle to challenge the Service's methods in coming to an enhancement finding is to challenge the new enhancement determinations themselves—findings that affect the ability to import a sport-hunted trophy. In

other words, these new enhancement findings do not create a live controversy over the withdrawn ones.

Furthermore, plaintiffs do not—and could not—argue that were the Service to issue a country-wide enhancement finding like the one challenged in this case that it would evade review. After all, the D.C. Circuit effectively reviewed the 2014 and 2015 enhancement findings in *Safari Club II*. And plaintiffs cannot keep their claims alive on the basis that future litigation challenging the issuance of specific imports permit might evade review. If the concern is that those individual adjudication decisions are too short in duration to be fully litigated, the capable-of-repetition-yet-evading-review exception can be applied in that context.

The voluntary cessation doctrine is equally inapplicable. The idea behind the exception is that a "defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of Earth v. Laidlaw*, 528 U.S. 167, 189 (2000) (internal citations omitted). Here, the 2017 finding suffered from the same procedural deficiencies as the 2014 and 2015 findings from *Safari Club II*: The Service failed to employ notice-and-comment rulemaking in enacting what amounted to a legislative rule. *See Safari Club II*, 878 F.3d at 333. So, the withdrawal of the 2017 finding was not a voluntary cessation but rather a corrective action by the Service. And "[c]orrective action by an agency is one type of subsequent development that can moot a previously justiciable issue." *Nat. Res. Def. Council*, 680 F.2d at 814. This is "more accurately characterized as the provision of appropriate relief to petitioner than as the 'cessation of illegal conduct.'" *Id.* at 814 n.8.

Because claims one and two challenge the withdrawn 2017 country-wide elephant finding, there is no live controversy. Moreover, no mootness exception applies. The Court lacks jurisdiction to hear these claims, and they must be **DISMISSED**.

**B. Plaintiffs' challenge to the March Memo's rescission of prior enhancement and non-detriment findings must be dismissed either for lack of standing or because of collateral estoppel.**

In its third cause of action, plaintiffs allege the Service violated the APA by rescinding prior enhancement and non-detriment findings in the March Memo without public notice and comment. Second Am. Compl. ¶¶ 148–54. This claim greatly broadened the scope of this action: plaintiffs challenge not only the rescission of prior Zimbabwe elephant findings, but rather the withdrawal of "all previous countrywide enhancement findings" in the March Memo.[2] *See id.* ¶ 149; Pls.' Opp. Mot. Dismiss 41. These included findings from many countries, involving lions and bontebok in addition to elephants. Federal Defendants' Mot. Dismiss 15–16. They included both positive enhancement findings (such as the 2017 Zimbabwe findings), paving the way for the importation of sport-hunted elephant trophies, and negative enhancement findings (such as the 2015 Zimbabwe elephant findings), prohibiting the importation of such trophies. Second Am. Compl. ¶ 123; Intervenor-Defendants' Mot. Dismiss Ex. 1. For the reasons stated below, plaintiffs lack standing to maintain a challenge to the rescission of any positive enhancement findings or any non-elephant or non-Zimbabwe findings. And although plaintiffs may sufficiently allege facts supporting standing to challenge the withdrawal of some of the negative findings prohibiting trophy imports, plaintiffs are collaterally estopped from bringing those claims. So, plaintiffs' third cause of action will be **DISMISSED**.

---

[2] In addition to the 2017 elephant findings, the March Memo withdrew the following enhancement findings: 1997, 2014, and 2015 findings for elephants in Zimbabwe; 1997, 2014, and 2015 findings for elephants in Tanzania; a 1995 finding for elephants in South Africa; a 1997 finding for bontebok taken in South Africa; 2016 and 2017 findings for lions in South Africa; a 1997 finding for elephants in Botswana; a 1995 finding for elephants in Namibia; a 2012 finding for elephants in Zambia; a 2017 finding for lions in Zambia; and the 2017 finding for elephants in Zambia. Intervenor-Defendants' Mot. Dismiss Ex. 1, ECF No. 42-1. Additionally, the Service withdrew the following CITES non-detriment findings: 2014, 2015, and 2017 finding for elephants in Tanzania; and 2017 finding for elephants in Zambia. *Id*

*i. Plaintiffs lack standing to challenge the withdrawal of positive enhancement findings or any non-elephant or non-Zimbabwe negative findings.*

In order to bring suit, litigants must establish Article III standing. *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1156–57 (D.C. Cir. 2005). Standing consists of three elements:

> (1) the plaintiff must have suffered injury in fact, an actual or imminent invasion of a legally protected, concrete and particularized interest; (2) there must be a causal connection between the alleged injury and the defendant's conduct at issue; and (3) it must be "likely," not "speculative," that the court can redress the injury.

*Id.* at 1157 (quoting *Lujan*, 504 U.S. at 560–61).

"Whether a party's claim requires dismissal because of an inability to establish standing depends on the stage of the litigation." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). At the pleadings stage, plaintiffs "must state a plausible claim that [they have] suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits." *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015). "[G]eneral factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the Court] presum[es] that general allegations embrace those specific facts that are necessary to support the claim." *Bennett v. Spear*, 520 U.S. 154, 167–68 (1997). However, the Court does "not assume the truth of legal conclusions, nor do[es it] accept inferences that are unsupported by the facts set out in the complaint." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).

"[S]tanding is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996). Plaintiffs must separately demonstrate standing with respect to each claim. *Daimler-Chrysler Corp. v. Cuno*, 54 U.S. 332, 352 (2006). Even so, plaintiffs seem to argue that they can challenge the withdrawal of findings relating to animals and countries not even mentioned in their complaint. The plaintiffs cite *WildEarth Guardians v. Jewell* for the proposition that "[a]s long as [p]laintiffs

are injured by the challenged action, [d]efendants cannot defeat standing by showing that some aspect of the decision may not injure plaintiffs." Pls.' Opp. Mot. Dismiss 37 (citing 738 F.3d 298, 307 (D.C. Cir. 2013)). While defendants cannot defeat standing in such a way, this Court cannot reinstate or declare invalid findings that have no demonstrable effect on plaintiffs' interests. The Courts will only address the merits of those rescissions that actually cause plaintiffs injury-in-fact.

FoA and ZCTF are conservation organizations dedicated to the preservation and the sustainability of wildlife. Second Am. Compl. ¶¶ 19–23. They oppose sport hunting of African elephants and believe that allowing the importation of sport-hunted trophies directly harms animals in the wild and aids in the illegal trafficking of these animals and their parts. Feral Decl. ¶¶ 8–9, ECF No. 48-1; Rodrigues Decl. ¶¶ 3,4, 20, ECF No. 47-2. The organizations claim both associational standing through their members, Pls.' Opp. Mot. Dismiss 35–42, and standing in their own right as organizations. *Id.* at 42–45.

To establish standing in its own right, an organization is required, "like an individual plaintiff, to show 'actual or threatened injury in fact that is fairly traceable to the illegal action and likely to be redressed by a favorable court decision.'" *Equal Right Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011) (quoting *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990). Separately, an "association 'has standing to sue under Article III of the Constitution of the United States only if (1) at least one of its members would have standing to sue in his own right; (2) the interest it seeks to protect is germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the member to participate in the lawsuit.'" *Am. Trucking Ass'ns v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 247 (D.C. Cir. 2013) (quoting *Rainbow/Push Coal. v. FCC*, 330 F.3d 539, 542 (D.C. Cir. 2003)). Where, as here, "plaintiffs allege injury resulting from violation of a *procedural* right afforded to them by statute and designed to protect

their threatened concrete interest, the courts relax—while not wholly eliminating—the issues of imminence and redressability, but not the issues of injury in fact or causation." *Ctr. for Law & Educ.*, 396 F.3d at 1157. "If one party has standing in an action, a court need not reach the issue of the standing of other parties when it makes no difference to the merits of the case. *In re Idaho Conservation League*, 811 F.3d 502, 509 (D.C. Cir. 2016) (internal quotations omitted) (quoting *Ry. Labor Execs. Ass'n v. United States*, 987 F.2d 806, 810 (D.C. Cir. 1998).

Here, neither FoA nor ZCTF have plausibly alleged an injury in fact to themselves or their members from the March Memo's rescission of positive enhancement findings or findings related to countries other than Zimbabwe. First, because the complaint and the declarations submitted in support of standing focus exclusively on elephants and Zimbabwe, plaintiffs have not plausibly alleged injury in fact from the rescission of non-Zimbabwe, non-elephant findings.

Moreover, the plaintiffs' entire case is premised on the proposition that allowing the importation of sport-hunted elephant trophies from Zimbabwe into the United States increases both the legal and illegal killing of African wildlife, harming the plaintiffs' aesthetic, professional, scientific, recreational, and organizational interests. *See* Second Am. Compl. ¶¶ 2–7, 56–57, 61; Rodrigues Decl. ¶¶ 22–27, 30, 32; Feral Decl. ¶¶ 2, 8–10, 12–14. As previously described, elephant and lion trophies may not be imported to the United States absent a finding that the killing of the animals enhances the survival of the species. *Supra* Part I.A. A *positive* enhancement finding, then, leads to increased killing of African wildlife under plaintiffs' own theory. This point is only buttressed by plaintiffs' desire to set aside the 2017 positive elephant findings in its first two causes of action.

Here, the March Memo withdraws a number of positive enhancement findings—relevantly, the 1997 and 2017 Zimbabwe elephant findings—explicitly stating that they "are no longer

effective for making individual permit determinations for imports of those sport-hunted ESA-listed species." Intervenor-Defendants' Mot. Dismiss Ex. 1. In other words, a permit applicant may no longer rely on the withdrawn findings in order to gain permission to import a trophy to the United States.

Plaintiffs put forth no plausible theory for how the withdrawal of these *positive* enhancement findings without public notice and comment equates to an injury in fact for either organization. Instead, they only point to the Service's comment that it would continue to use the information from the 2017 findings as appropriate along with newly submitted information, as appropriate. This is too speculative. The Court is left with the most obvious conclusion: if—as plaintiffs describe—positive findings increase the number of elephants killed, then plaintiffs are not harmed by the rescission of such findings. Because there is no injury in fact, plaintiffs lack standing to challenge the withdrawal of the 1997 or 2017 positive Zimbabwe elephant enhancement findings.

> ii. *Plaintiffs are collaterally estopped from challenging the rescission of the 2014 and 2015 negative findings prohibiting trophy imports.*

The March Memo also withdrew two findings directly related to plaintiffs' injuries: the 2014 and 2015 negative findings prohibiting elephant trophy import from Zimbabwe. Intervenor-Defendants' Mot. Dismiss Ex. 1. Unfortunately for plaintiffs, they already argued before this very Court—unsuccessfully—that the Service could not withdraw the 2014 and 2015 findings without soliciting public notice and comment. *See* Order, *Safari Club Int'l v. Jewell*, No. 14-cv-670-RCL, ECF No. 157. They are collaterally estopped from doing so again.

"Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action

involving a party in the first case." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). Three elements

must be met before a Court can apply the doctrine:

> First, the same issue now being raised must have been contested by the parties and
> submitted for judicial determination in the prior case. Second, the issue must have
> been actually and necessarily determined by a court of competent jurisdiction in
> that prior case. Third, preclusion in the second case must not work a basic
> unfairness to the party bound by the first determination.

*Yamaha Corp. of Am. v. U.S.*, 961 F.2d 245, 254 (D.C. Cir. 1992) (citations omitted). Here, all

three elements are easily met.

After remand by the D.C. Circuit in *Safari Club II*, plaintiffs, who were intervenor-

defendants in that case, argued that the Court should retain jurisdiction because the March Memo

withdrew the 2014 and 2015 finding without undertaking notice-and-comment rulemaking. *See*

*Safari Club Int'l v. Jewell*, No. 14-cv-670-RCL, ECF No. 153. They argued—like they do now—

that the procedurally defective "rules" could not be repealed without going through APA

rulemaking procedures. *Id.* "The Court [was] not persuaded by this argument." Order, *Safari*

*Club Int'l v. Jewell*, No. 14-cv-670-RCL, ECF No. 157. The Court held:

> Here, the Service did not conduct notice-and-comment rulemaking in the first place.
> In fact, that was the reason why the D.C. Circuit found them to be procedurally
> deficient. [FoA and ZCTF] point to no case where a court has required an agency
> to go through notice-and-comment in order to withdraw a "rule" that was found to
> be deficient because it itself did not go through notice-and-comment. The Service
> in this case intended to proceed by adjudication, but the D.C. Circuit found the
> Service's attempt to be more akin to legislative rulemaking. The Service withdrew
> the Zimbabwe and Tanzania findings in order to comply with that ruling.

*Id.* The Court sees no basic unfairness in precluding the same parties from making the same

argument about the same findings to the same court.[3] Plaintiffs third cause of action is

**DISMISSED.**

---

[3] Furthermore, were the plaintiffs not estopped from bringing this claim, the Court would rule the same way. It is true
that, in general, the repeal of a legislative rule must go through notice and comment and that an agency may not

### C. In count four, plaintiffs misinterpret the 1997 Proposed Rule and this Court's Opinion.

In their fourth claim, plaintiffs argue that the 1997 Proposed Rule created a publication requirement for all elephant enhancement findings and that by switching to case-by-case adjudication, the March Memo effectively eliminated that requirement in violation of the APA. Second Am. Compl. ¶¶ 155–60; *see also* Pls.' Opp. Mot. Dismiss 28–30. Because this claim relies on faulty readings of both this Court's prior opinion and the 1997 Proposed Rule itself, this cause of action fails to state a claim.

In 2014, although the Service announced its interim suspension on importation of elephant trophies on April 4th in a service bulletin, it did not publish notice in the Federal Register until May 12th. *See* 79 Fed. Reg. 26,986-01. The public notice stated that the suspension became onApril 4th. *Id.* But the 1997 Proposed Rule explicitly stated, "The enhancement findings for importation of sport-hunted elephant trophies from . . . Zimbabwe are on file . . . and remain in effect until the Service finds, based on new information, that the conditions of the special rule are no longer met and has published notice of any change in the Federal Register." 62 Fed. Reg. 44,627-01, 44,633.

In *Safari Club I*, the Court held that the plain language of the rule indicated a binding commitment on the part of the agency to provide public notice before changing the 1997 positive findings. 213 F. Supp. 3d at 73. As a remedy, the Court ordered that the effective date of the interim suspension would be May 12, 2014, as opposed to April 4, 2014. *Id.*

---

exclude itself from notice and comment requirements simply by declaring that the rule is "defective" on its own accord. *See Consumer Energy Council v. FERC*, 673 F.2d 425, 447 n.79. But it must be true that an agency is not required to go through notice and comment to repeal a rule deemed improper by an intervening change in law. Otherwise, an agency could be forced to enforce plainly wrong—and maybe even unconstitutional—regulations until either a Court struck it down or the agency completes the notice and comment process.

Plaintiffs argues that the Court's holding and the rule itself mandate public notice for all future elephant enhancement findings. But this goes against the rule's plain text. The 1997 Proposed Rule refers to the enhancement findings that were then "on file." Hence, the language does not leave the agency discretion for how it will change only the 1997 finding, not all enhancement findings going forward. Between the 2014 interim finding and the 2014, 2015, and 2017 final findings, we are long past the first change to the enhancement findings then "on file." Not to mention that there is an amended species-specific rule for African elephants.

The Proposed Rule describes until when the 1997 enhancement findings for African elephants would remain in effect. It did not create a publication requirement in perpetuity. Accordingly, plaintiffs' fourth cause of action will be **DISMISSED**.

### D. Plaintiffs' fifth cause of action fails to state a claim.

Plaintiffs' fifth cause of action challenges the Service's announcement that it would no longer make country-wide enhancement findings, instead opting to make those findings on a case-by-case basis as part of the permitting process. Second Am. Compl. ¶¶ 161–65. Plaintiffs argue "both the statutory requirements of the ESA and the APA prohibit FWS from making rules necessary for the preservation of threatened species, such as enhancement findings, on a case-by-case basis, closed-off from the public." Pls.' Opp. Mot. Dismiss 30. Instead, plaintiffs argue that enhancement findings must be made via regulation. *Id.* at 30–31. Even if plaintiffs have standing to make this argument, they fail to state a claim upon which relief may be granted.

> *i. Plaintiffs have plausibly alleged organizational standing to bring claim five.*

The Court begins with standing. Because this aspect of the March Memo only changes the manner in which enhancement and non-detriment findings, plaintiffs cannot plausibly allege that switching to a case-by-case system, alone, causes more elephants to be killed or makes it more

likely that trophies will be imported into the United States. Therefore, the organizations may not rely on aesthetic or recreational interests as a basis for standing. Instead, plaintiffs' best argument is that the organizations themselves are harmed by the change in policy and have standing to sue.[4]

To establish standing in its own right, an organization must, "like an individual plaintiff, [] show 'actual or threatened injury in fact that is fairly traceable to the illegal action and likely to be redressed by a favorable court decision.'" *Equal Right Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011) (quoting *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990).

To demonstrate injury in fact, "[a]n organization must allege more than a frustration of its purpose because frustration of an organization's objectives 'is the type of abstract concern that does not impart standing.'" *Food & Water Watch*, 808 F.3d at 919 (quoting *Nat'l Taxpayers Union, Inc. v. United Staes*, 68 F.3d 1428, 1433 (D.C. Cir. 1995). Rather, an organization wishing to establish standing must have "suffered a concrete and demonstrable injury to [its] activities." *People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (internal quotations omitted) [hereinafter, "PETA"]. This determination is made through a two-part inquiry—the Court asks "first, whether the agency's action or omission to act injured the [organization's] interest and, second, whether the organization used its resources to counteract that harm." *Id*. at 1094.

To satisfy these elements, the challenged conduct must "perceptibly impair[] the organization's ability to provide services." *Food & Water Watch*, 808 F.3d at 919. It must inhibit

---

[4] Although the federal defendants mention informational standing in their motion to dismiss, *see* Federal Defs.' Mot. Dismiss 17, plaintiffs put forth no argument for informational standing in their opposition and fail to identify any statute entitling them to any information deprived under the Service's new policy. *See Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016) (stating that in order to claim informational standing, a plaintiff must allege: "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure.").

the organization's daily operations, *PETA*, 797 F.3d at 1094, or "ma[k]e the organization's activities more difficult." *Nat'l Treasury Emps. Union*, 101 F.3d at 1430.

Here, FoA puts forth three injuries to support organizational standing. First, it argues that a large part of its mission is to advocate for the end of trophy hunting. Pls.' Opp. Mot. Dismiss 43; *see also* Feral Dec. ¶¶ 2, 8–9. The change to case-by-case determinations "forces [FoA] to expend additional resources to continually determine if and when new enhancement findings are being made," including the filing of Freedom of Information Act ("FOIA") actions to obtain this information. Pls.' Opp. Mot. Dismiss 43; *see also* Feral Dec. ¶¶ 25–27. In a similar vein, plaintiffs also argue that they "regularly comment on actions impacting imperiled wildlife, including African elephant, and would comment on enhancement findings if the agency provided notice and opportunity to comment." Pls.' Opp. Mot. Dismiss 44; *see also* Feral Dec. ¶¶ 30–32; Rodrigues Decl. ¶ 28.

But both of these injuries are insufficient for organizational standing. D.C. Circuit "precedent makes clear that an organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury." *Food & Water Watch*, 808 F.3d at 919. "This is true whether the advocacy takes place through litigation or administrative proceedings." *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015). And these increased expenditures relate directly and exclusively to pure issue-advocacy. *See Ctr. for Law & Educ.*, 396 F.3d at 1162 (rejecting a claim to organizational standing when "the only 'service' impaired is pure issue-advocacy"). In other words, plaintiffs' asserted injury "is essentially an argument that [the Center] cannot allocate issue advocacy expenses in the way it would prefer, which is insufficient to establish standing." *Ams. for Safe Access*, 706 F.3d at 458.

Plaintiffs third argument carries more weight. FoA states that in support of its mission to end trophy hunting, it regularly "reports on the negative impacts of trophy hunting as well as the organization's progress in addressing this issue through its magazine *ActionLine*, its website, educational presentations to professional associations, and outreach to other media outlets." Feral Decl. ¶ 2. The Service's change to case-by-case enhancement determinations and decision to "no longer make enhancement findings public seriously inhibits [FoA's] ability to do this work." *Id.* ¶ 24; Pls.' Opp. Mot. Dismiss 43–44. FoA must resort to filing FOIA actions to receive the information it would otherwise have and be able to supply its members, the interested public, and the media. Feral Decl. ¶¶ 2.

"[A]n organization does not suffer an injury in fact where it 'expend[s] resources to educate its members and others' unless doing so subjects the organization to 'operational costs beyond those normally expended.'" *Food & Water Watch*, 808 F.3d at 920 (quoting *Nat'l Taxpayers Union*, 68 F.3d at 1434). That is what FoA alleges here. FoA argues that information that they used to receive from the government and use to educate its members and interested parties has been improperly kept from it. In order to fulfill a critical part of their mission—keeping its members and the interested public abreast on the latest developments in trophy hunting—FoA has been forced to expend resources by filing FOIA actions. If the case were to go on, FoA would have to provide evidence that these FOIA expenses were beyond those normally expended. But at this stage of the proceedings, FoA has plausibly alleged injury in fact. *See PETA*, 797 F.3d at 1094 (finding organizational standing where the action challenged "deprived PETA of key information that it relies on to educate the public," directing impeding PETA's ability to perform its public-education services). Additionally, because FoA argues that the March Memo itself "renders it impossible" for the organization to provide its education services, the Court has no

difficulty at this stage finding causation and redressability. *See* Pls.' Opp. Mot. Dismiss 43–44. Plaintiffs have standing to bring their fifth cause of action.

### ii. *Plaintiffs fifth cause of action fails on the merits.*

Having established standing though only gets the plaintiffs so far because they fail to state a claim. For threatened species, the ESA provides:

> Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under [16 U.S.C. § 1538(a)(1)], in the case of fish or wildlife.

16 U.S.C. § 1533(d). Plaintiffs read this rule to mean that enhancement findings must be made through regulation and therefore that the Service is statutorily prohibited from conducting case-by-case adjudications of permit applications as contemplated by the March Memo.[5]

Even accepting plaintiffs' premise that a case-by-case adjudication is not a regulation, the Court sees no such requirement. Instead, the statutory scheme empowers the Secretary of Interior to extend Section 1538(a)(1)'s protections for endangered species to threatened species. All Section 1533(d) requires is that *this* decision be done through regulation. The Service, to which the Secretary has delegated the authority for administering the ESA, has done just that.

The Service issued a regulation that extends the ESA's prohibitions on endangered species to all threatened species unless the Service has issued a special rule to govern a particular species. 50 C.F.R. §§ 17.31(a), (c). By separate regulation, the Service issued a species-specific rule for African elephants. *See* 50 C.F.R. § 17.40(e). Upon its issuance, the Service announced that it was

---

[5] In plaintiffs' briefing, they also appear to argue that the Service will necessary violate the APA when it issues subsequent enhancement findings upon individual adjudication. *See* Pls.' Opp. Mot. Dismiss 32–33. In support of this argument, plaintiffs rely primarily on the D.C. Circuit's determination in *Safari Club II* that the 2014 and 2015 country-wide enhancement findings were legislative rules requiring notice-and-comment rulemaking. 878 F.3d at 320–21. But no enhancement finding determined in the course of individual adjudication is presently before the Court and the Court will not speculate about whether future actions by the Service, unknown to this Court, violate the APA.

"adopting measures that are necessary and advisable for the current conservation" of African elephants. 81 Fed. Reg. 36,388-01.

That regulation extends to all of the general prohibitions and exceptions for threatened wildlife included in 50 C.F.R. §§ 17.31 and 17.32 except as provided in the species-specific rule. *Id.* One of the exceptions the regulation provides is that "African elephant sport-hunted trophies may be imported into the United States provided [*inter alia*] . . . [a] determination is made that the killing of the trophy animal will enhance the survival of the species and the trophy is accompanied by a threatened species permit issued under § 17.32." *Id.* § 17.40(e)(6)(B).

The Service is therefore not acting outside its statutory authority, but rather within it. All the Service had to do under the ESA was set protections for threatened species by regulation. How and when the Service carries out that regulation—as it does when it makes an enhancement finding or grants a permit—is left to the agency. Because plaintiffs' fifth cause of action turns on a faulty reading of the statute, that claim fails on the merits.

## IV.     CONCLUSION

The Court lacks jurisdiction to hear the majority of plaintiffs' claims. Claims one and two are moot. Additionally, plaintiffs lack standing to challenge the Service's withdrawal of positive enhancement findings or any non-elephant or non-Zimbabwe findings. And plaintiffs are collaterally estopped from challenging the rescission of the 2014 and 2015 Zimbabwe elephant findings. Lastly, Plaintiffs' fourth and fifth causes of action fail to state claims upon which relief may be granted. As such, the case will be **DISMISSED**. A separate order has issued.


Date:  4/8/19

ROYCE C. LAMBERTH
United States District Judge